FRUIT GROWERS SUPPLY CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 30333. Promulgated November 13, 1930.

*Leonard B. Slosson, Esq.*, and *Melvin D. Wilson, Esq.*, for the petitioner.

*M. B. Leming, Esq.*, for the respondent.

320

322

OPINION.

SEAWELL: The primary question here presented is whether the petitioner is exempt from taxation under the provisions of section 231 (11) of the Revenue Acts of 1918 and 1921. In its brief, the petitioner admits (and we think properly so) that the Revenue Act of 1918 does not include corporations which act as purchasing agents among those exempt from taxation under its provisions, and therefore the petitioner can not be considered exempt for 1919 and 1920. This leaves for consideration the applicability of section 231 (11) of the Revenue Act of 1921, which reads as follows:

SEC. 231. That the following organizations shall be exempt from taxation under this title—

\* \* \* \* \* \* \*

(11) Farmers', fruit growers', or like associations, organized and operated as sales agents for the purpose of marketing the products of members and turning back to them the proceeds of sales, less the necessary selling expenses, on the basis of the quantity of produce furnished by them; or organized and operated as purchasing agents for the purpose of purchasing supplies and equipment for the use of members and turning over such supplies and equipment to such members at actual cost, plus necessary expenses.

We think it well established that petitioner was organized for the purpose of purchasing supplies for members of the California Fruit Growers Exchange, which members were likewise the stockholders of the petitioner, and it may also have been intended that it would not operate as a profit-making organization, though the powers granted under its charter are so broad that it might well engage in almost every kind of business, some of which might not be even remotely connected with the purchase of supplies for its members. We are concerned, however, not alone with what may have been the purpose in organizing the petitioner, but also with the manner in which it operated. The statute says " organized and operated " for the purposes therein named. Provisions of the law granting exemption from taxation must be strictly construed against those claiming the exemption. *Waynesboro Manufacturers Association*, 1 B. T.

A. 911; *Farmers' Co-operative Milk Co.*, 9 B. T. A. 696; *Northwestern Drug Co.*, 14 B. T. A. 222; and *Riverdale Co-operative Creamery Association*, 18 B. T. A. 1159.

And when we come to examine the manner in which petitioner's operations were carried on, we are not convinced that it can be considered exempt from taxation. While its dealings with nonmembers arose through the necessity for disposing of certain grades of lumber in the most economical manner and in accordance with its understanding with the Bureau of Forestry, it is nevertheless true that this phase of its business is carried on for profit in the same sense as that of the ordinary taxable corporation. In order to have a supply of timber available from which to manufacture box shook, petitioner acquired a large boundary of valuable timber and also contracted with the Bureau of Forestry for large additional amounts of timber. Box shook, an essential supply for petitioner's stockholders, the need for which had much to do with the formation of the petitioner, was manufactured from this timber, and in addition there was also manufactured lumber which was sold for commercial purposes and to persons other than members or stockholders. These latter sales were at prevailing market prices and resulted in substantial profits to the petitioner. While the foregoing uses of the lumber manufactured were in accordance with an understanding had with the Bureau of Forestry for using the timber to its highest purpose, we do not think this the sole reason for such sale or that the petitioner would have pursued a very different course in the absence of such an agreement. The reports of petitioner's manager show that it was considered both desirable and profitable to sell the higher grades of lumber in the open market, but that if such higher grades were needed for the manufacture of box shook, they could be so utilized.

When we consider the extent of petitioner's lumber operations, and a comparison of its sales to members with those made to nonmembers (the latter being largely of lumber), we are unable to say that the transactions with nonmembers are negligible. In terms of percentages, the nonmember sales range from 5.31 per cent of the total sales in 1920 to 12.92 per cent in 1923. In 1922, a year not before the Board because of an overassessment determined for such year, the percentage was 20.21 per cent. The sales were substantial in amount, running from slightly less than half a million to more than a million and a half dollars and the profits from this nonmember business were likewise substantial. From its organization to 1923, approximately 13 per cent of its business had been with nonmembers. The petitioner's answer to the profit feature of the nonmember business is that this is not in fact a profit to the petitioner, but rather only an amount realized from such business which serves to reduce the cost of

supplies to members. In a sense this is true, namely, the profits from the nonmember business are paid to the members as dividends and therefore the net amount paid by members for supplies might be said to have been reduced to that extent. But if we carry this argument to its logical conclusion, might it not be possible for such a corporation to furnish supplies to members without cost or even pay them to take the supplies furnished? We can not think Congress intended to exempt such profits or that a corporation thus engaged should be exempt from taxation. Congress may well have had the foregoing situation in mind when it provided in the 1926 and 1928 Acts (section 231 (12)) that a cooperative purchasing association might still be considered exempt even though purchases were made for nonmembers, provided the value of such purchases does not exceed 15 per cent of all its purchases. And the further fact exists that the petitioner is necessarily a competitor of other corporations or individuals engaged in commercial activities in similar lines of business, and therein may well lie one of the reasons why Congress has not by specific enactment exempted from tax those corporations, including this petitioner, which, although engaged in some form of cooperative endeavor, are nevertheless commercial, competitive, and profitable with respect to a substantial portion of their business carried on. On the whole, we are of the opinion that the exemption claimed should not be allowed.

The next contention advanced by the petitioner is that, even if it is held not to be exempt under section 231 (11) of the Revenue Act of 1921, it is entitled to a deduction, as patronage dividends paid or accrued, of its entire surplus earnings for each year. And closely related thereto is the further contention that in any event the petitioner could have no taxable income under the Sixteenth Amendment to the Constitution. What the Commissioner did was first to determine the petitioner's net income for each year in a manner similar to that which would be followed in the case of any taxable corporation. Since we have held that the petitioner is not an exempt corporation, his initial step in such a determination would seem to be a proper one. From the total net income as thus determined the Commissioner then allowed a further deduction of all patronage dividends which were applicable to the respective years and considered the difference between the total net income and the patronage dividends as taxable income. And if we understand correctly the amounts which have been allowed in this latter deduction, the effect was to give the petitioner the benefit as a deduction of all patronage dividends declared or paid during the years with which we are concerned. The essence of what the petitioner asks is to say that all surplus earnings for a given year which have not been paid out as such dividends by the end of such year automatically

become patronage dividends accrued, without any action on the part of the petitioner declaring them as dividends, and that they are therefore deductible under its accrual system of accounting. This amounts to little more than saying that the petitioner can have no taxable income.

We are unable to agree with the foregoing contention. In the first place, we find nothing in the governing statute which provides for a partial exemption from taxation of corporations of the character of the petitioner. However, as stated by the Conference Report of Congress in considering the 1926 Act (Conference Report No. 356, p. 36, dated February 22, 1926), the Treasury Department in its regulations has construed the statute with which we are concerned with "great liberality" to the end that substantial justice may be done to an association which is engaged in cooperative marketing or purchasing work but which may not be exempt from taxation. In the instant case the effect of what the Commissioner did in allowing a deduction on account of patronage dividends was to relieve the petitioner from tax on account of what would otherwise be considered taxable profit. This may well be justified on the ground that to the extent these patronage dividends arise wholly out of business done with members they are rebates on such business and therefore should serve to reduce or eliminate profit arising from such transactions. The petitioner now asks that we increase the patronage-dividend deduction on account of an amount which has not been returned to the members and when no dividend declaration has been made with respect thereto. We find nothing in the petitioner's by-laws which would cause these patronage dividends to accrue as such without corporate action setting them apart as a liability of the petitioner to its members. The by-laws provide that it shall be the duty of the directors to " declare dividends out of surplus profits when such profits shall, in the opinion of the directors, warrant the same, subject to the provisions" of another section wherein it is provided that the directors are authorized to prescribe " the time and manner of readjustment with or refund to its patrons." A reasonable interpretation of the foregoing would seem to be that corporate action is required before patronage dividends accrue, and this conclusion is consistent with the minutes of the board of directors for the various years here involved. Illustrative of such minutes is the following:

The Manager reported that the total amount of business transacted for the season ending August 31, 1920 amounted to $9,837,073.83 that after deduction of the operating expenses and providing for the 6% annual interest on capital stock, and the transfer of $9,837.09 to the reserve fund, there remained for distribution the sum of $257,459.01, and recommended that the sums of $201,786.89 on packing house supplies and $55,672.12 on orchard supplies be

returned to members in proportion to their purchases as a further reduction in prices paid for materials, when funds were available for that purpose.

Moved by Whitcomb, seconded by Swan that the recommendation be approved. CARRIED.

The argument that because the by-laws provided that the petitioner should furnish supplies to members at cost all excess earnings would accrue as deductible patronage dividends may well be answered by the fact that excess earnings are attributable both to member and nonmember business. The petitioner urges that even the nonmember profits should be treated as a reduction of cost under its by-laws and therefore all excess earnings constitute deductible patronage dividends. This would amount to an indirect means of exempting from taxation profits of this character which, as stated under our discussion of the first issue, we do not consider proper. Certainly, there is nothing in the character of such earnings which would cause them to be considered other than income within the meaning of the Sixteenth Amendment.

The petitioner calls our attention to various cases decided by the Board where patronage dividends were considered accrued and therefore allowable as a deduction even though not paid in the year claimed, but we think those cases are distinguishable from the case at bar. The additional amount allowed in *Home Builders Shipping Association*, 8 B. T. A. 903, had been determined and authorized by the directors during the year for which the deduction was claimed. In *Anamosa Farmers Creamery Co.*, 13 B. T. A. 907, the books of the petitioner disclosed a net income at the close of the year which was then credited to the members or stockholders in proportion to the business done with them. The Board held that the amount so credited constituted an accrued patronage dividend which was deductible. In *Farmers' Union Cooperative Association*, 13 B. T. A. 969, the amount allowed was regularly authorized during the year for which claimed, though in the following year it was voted that the distributions authorized should be returned. We considered the foregoing situations different from the case at bar, where we are asked to say that all excess earnings, including the increase made by the Commissioner in his determination, should be considered to have accrued as patronage dividends without any setting apart or payment of such earnings to the members.

The further contention is advanced that the fixed dividend of 6 per cent paid by the petitioner is also deductible in computing its net income. While these payments are referred to in one of the by-laws as " interest," it is not understood that it is seriously contended that they differ in any material respects from the ordinary dividend of a corporation. In fact, they are so treated by the petitioner in its returns as filed for 1919, 1920, and 1921, not only in determining taxable net income, but also in adjustments for invested capital pur-

poses. The by-laws provide that these amounts shall be paid "if and when earned on the stockholders' investment in the corporation." They are not like interest which would be payable irrespective of earnings, and we find nothing in the by-laws which would be ground for legal proceedings against the petitioner for nonpayment when the earnings do not justify such payment. We are of the opinion that this question is controlled by prior decisions of the Board wherein similar payments have been held not deductible. *Sacred Heart Cooperative Mercantile Co.*, 2 B. T. A. 24; *Farmers Cooperative Association*, 5 B. T. A. 61; *Trego County Cooperative Association*, 6 B. T. A. 1275; and *Riverdale Co-Operative Creamery Association, supra.*

The final issue is whether the statute of limitations has run with respect to the assessment of the deficiencies for 1919, 1920, and 1921. Admittedly, the original statutory period has run on the return as filed for each of the above years, but the Commissioner relies on certain waivers, which, if valid, are sufficient to extend the time for assessment beyond June 17, 1927, the date of the deficiency notice. The basic objections of the petitioner to these waivers are shown by the following paragraph in its brief:

The respondent did absolutely nothing to prove that the statute had been extended except that his counsel at the trial offered in evidence certified photostatic copies of certain papers. The petitioner stipulated that it had signed the originals of those papers. No other evidence was produced. The respondent did not prove where the originals were lodged. He did not prove who signed the originals on behalf of the other party to the documents. He did not prove that the person who signed them had authority to do so. He did not prove that they were signed by the Commissioner, nor that the Commissioner had authorized anyone else to sign them, or that if the Commissioner had authorized anyone else to sign them that the person authorized had signed them.

Substantially the same objections have heretofore been considered by the Board in other cases and held ineffective. *Trustees for Ohio & Big Sandy Coal Co. et al.*, 9 B. T. A. 617 (affirmed on this point, *Trustees for Ohio & Big Sandy Coal Co.* v. *Commissioner*, 43 Fed. (2d) 282; *Pantlind Hotel Co. et al.*, 9 B. T. A. 878; *National Piano Manufacturing Co.*, 11 B. T. A. 46; and *Consumers Ice Co.*, 11 B. T. A. 144. See also *Liberty Baking Co.* v. *Heiner*, 34 Fed. (2d) 513 (affd., 37 Fed. (2d) 203); *Diamond Alakali Co.* v. *Heiner*, 39 Fed. (2d) 645; and *Pantages Theatre Co.* v. *Lucas*, 42 Fed. (2d) 810, affirming *Pantages Theatre Co.*, 17 B. T. A. 82). In fact, the petitioner inferentially admits in its brief that the decisions of the Board are contrary to its position, but suggests, for reasons therein given, that such cases have been decided erroneously. We are of the opinion that the reasons advanced by the petitioner are fully answered in ·

the authorities cited above, and accordingly hold that the deficiencies in question are not barred.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

---

LANSDON, dissenting: I disagree with the majority opinion herein. The petitioner was organized and.in the taxable years was operated for the sole purpose of purchasing supplies for the use of the members of the California Fruit Growers Exchange, a cooperative organization that markets the agricultural commodities produced by its own members and no others. The stockholders or members of the petitioner are the component units of the Exchange and all the capital used is supplied by such members who accumulated, held, and used it for the purpose of their organization.

One of the major needs of the Exchange is box shook for making containers in which fruit is shipped to the markets. Without abundant supplies of shook accessible at economically advantageous prices, the Exchange would be unable to realize the purposes for which it was organized. In order to effect substantial savings on the cost of shook, the petitioner found it advisable to acquire suitable timber and create the agencies for converting the same into material for the use of its members. Box shook, as set forth in the majority opinion, does not require high grade timber in its production. In the lumber cut from the timber of the petitioner there is necessarily a considerable quantity grading so high that its use for shook would be uneconomical and wasteful. This high grade lumber was sold, in part at least, to the public. It seems clear that. such sales were a mere incident of the activities necessary to effect the purpose of the petitioner. If the membership had absorbed the entire output of high grade lumber none would argue that the petitioner is not entitled to exemption from tax under the provision of law upon which it relies. The annual average sales of lumber to nonmembers in the taxable years were only slightly in excess of 10 per cent of the total sales of all supplies to members and the proceeds thereof, whether retained as operating capital, or distributed profits to the members, served the single primary purpose of the petitioner's organization, which was to reduce the cost of necessary supplies for use in the production and marketing of fruit.

The record discloses that except in 1922 and 1923 petitioner's sales of lumber to outsiders averaged less than 6 per cent of its total turnover. In those years there were heavy and damaging frosts in the citrus fruit belt which reduced production and the growers' requirements for shook. This left an abnormal amount of material in the hands of the petitioner which sound business practice required that

it should dispose of on the best terms possible. It is obvious, therefore, that the sales of lumber in 1922 and 1923 are not indicative of any departure from the fixed policy of the petitioner, but resulted from extraordinary conditions over which it had no control.

It is apparent from the record that the manufacturing operations of the petitioner were not sufficiently extensive to supply the needs of its members for the quality of shook required in their business. The sale of higher grades of lumber to be used for purposes to which it was best adapted was in pursuance with an understanding with the Bureau of Forestry which was a part of the Departmental policy for the conservation of natural resources by the application of lumber and other products to the purposes for which they were best fitted. The sale of the higher grade lumber to outsiders and of some inferior shook to deciduous fruit growers enabled the petitioner to use the proceeds therefrom for purchasing for its members much suitable shook that it was unable to produce in its own operation and obviated any necessity for using high grade material where lower grades were equally or more adequate.

It is also of record that the sales of lumber to outsiders were at a profit-making price, while the sales of supplies to members were approximately at cost. If the usual commercial profit is added to the total of sales to members, it is obvious that the transactions with nonmembers constitute much less than 10 per cent of the total yearly business of the petitioner. It is hardly conceivable that Congress would create an exempt status for organizations like the petitioner and then take away all the advantages of exemption by the application of a definition to permitted activities narrowly precluding operations essential to success. Aside from the sale of the relatively small amount of its lumber production to nonmembers, there is nothing in the record that indicates that the petitioner is not entitled to the exemption provided in section 231 (11) of the Revenue Act of 1921. Cf. *Trinidad* v. *Sagrada Orden de Predicadores*, 263 U. S. 578.

ARUNDELL agrees with this dissent.