FARMERS MUTUAL COOPERATIVE CREAMERY, OF SIOUX CENTER, IOWA, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 70940. Promulgated September 30, 1935.

*A. C. R. Swensen, Esq.*, and *Arthur S. French, C. P. A.*, for the petitioner.

*J. H. Yeatman, Esq.*, for the respondent.

OPINION.

SMITH: This case involves a deficiency in income tax of $714.50 for the calendar year 1930. There seems to be no dispute as to the amount of the deficiency, provided the petitioner is not entitled to the exemption from income tax which it claims.

Petitioner claims that, under section 103 (12) of the Revenue Act of 1928 and article 532 of Regulations 74, it is a corporation or association organized and operated on a cooperative basis for the purpose of marketing dairy products of its members and other producers, and turning back to them the proceeds of sales, less the necessary marketing expenses, on the basis of the quantity or value of the products furnished by them, thus entitling it to exemption from income tax. The section of the act and article of the regulations referred to are as follows:

The following organizations shall be exempt from taxation under this title—

\* \* \* \* \* \* \*

(12) Farmers', fruit growers', or like associations organized and operated on a cooperative basis (a) for the purpose of marketing the products of members or other producers, and turning back to them, the proceeds of sales, less the necessary marketing expenses, on the basis of either the quantity or the value of the products furnished by them, or (b) for the purpose of purchasing supplies and equipment for the use of members or other persons, and turning over such supplies and equipment to them at actual cost, plus necessary expenses. Exemption shall not be denied any such association because it has capital stock, if the dividend rate of such stock is fixed at not to exceed the legal rate of interest in the State of incorporation or 8 per centum per annum, whichever is greater, on the value of the consideration for which the stock was issued, and if substantially all such stock (other than nonvoting preferred stock, the owners of which are not entitled or permitted to participate, directly or indirectly, in the profits of the association, upon dissolution or otherwise, beyond the fixed dividends) is owned by producers who market their products or purchase their supplies and equipment through the association; nor shall exemption be denied any such association because there is accumulated and maintained by it a reserve required by State law or a reasonable reserve for any necessary purpose. Such an association may market the products of nonmembers in an amount the value of which does not exceed the value of the products marketed for members, and may purchase supplies and equipment for nonmembers in an amount the value of which does not exceed the value of the supplies and equipment purchased for members, provided the value of the purchases made for persons who are neither members nor producers does not exceed 15 per centum of the value of all its purchases;

## Article 532 of Regulations 74:

ART. 532. *Farmers' cooperative marketing and purchasing associations, and corporations organized to finance crop operations.*—(*a*) Cooperative associations engaged in the marketing of farm products for farmers, fruit growers, livestock growers, dairymen, etc., and turning back to the producers the proceeds of the sales of their products, less the necessary operating expenses, on the basis of the products furnished by them, are exempt from income tax and shall not be required to file returns. Thus cooperative dairy companies which are engaged in collecting milk and disposing of it or the products thereof and distributing the proceeds, less necessary operating expenses, among the producers upon the basis of the quantity of milk or of butter fat in the milk furnished by such producers, are exempt from the tax. If the proceeds of the business are distributed in any other way than on such a proportionate basis, the association does not meet the requirements of the Act and is not exempt. An association which has capital stock will not for such reason be denied exemption, (1) if the dividend rate of such stock is fixed at not to exceed the legal rate of interest in the State of incorporation or 8 per cent per annum, whichever is greater, on the value of the consideration for which the stock was issued, and (2) if substantially all of such stock (with the exception noted below) is owned by producers who market their products or purchase their supplies and equipment through the association. Any ownership of stock by others than such actual producers must be satisfactorily explained in the association's application for exemption. The association will be required to show that the ownership of its capital stock has been restricted as far as possible to such actual producers. If by statutory requirement all officers of an association must be shareholders, the ownership of a share of stock by a nonproducer to qualify him as an officer will not destroy the association's exemption. Likewise, if a shareholder for any reason ceases to be a producer and the association is unable, because of a constitutional inhibition or other reason beyond the control of the association, to purchase or retire the stock of such nonproducer, the fact that under such circumstances a small amount of the outstanding capital stock is owned by shareholders who are no longer producers will not destroy the exemption. The restriction placed on the ownership of capital stock of an exempt cooperative association shall not apply to nonvoting preferred stock, provided the owners of such stock are not entitled or permitted to participate, directly or indirectly, in the profits of the association, upon dissolution or otherwise, beyond the fixed dividends. The accumulation and maintenance of a reserve required by State statute, or the accumulation and maintenance of a reasonable reserve or surplus for any necessary purpose, such as to provide for the erection of buildings and facilities required in business or for the purchase and installment of machinery and equipment or to retire indebtedness incurred for such purposes, will not destroy the exemption. An association will not be denied exemption because it markets the products of nonmembers, provided the value of the products marketed for nonmembers does not exceed the value of the products marketed for members.

(*b*) Cooperative associations engaged in the purchasing of supplies and equipment for farmers, fruit growers, live-stock growers, dairymen, etc., and turning over such supplies and equipment to them at actual cost, plus the necessary operating expenses, are exempt. The provisions of paragraph (*a*) relating to a reserve or surplus and to capital stock shall apply to associations coming under this paragraph. An association which purchases supplies and equipment for nonmembers will not for such reason be denied exemption,

provided the value of the purchases for nonmembers does not exceed the value of the supplies and equipment purchased for members, and provided the value of the purchases made for nonmembers who are not producers does not exceed 15 per cent of the value of all its purchases.

In order to be exempt under either (a) or (b) an association must establish that it has no net income for its own account other than that reflected in a reserve or surplus authorized in paragraph (a). An association engaged both in marketing farm products and in purchasing supplies and equipment is exempt if as to each of its functions it meets the requirements of the Act.

(c) Corporations organized by farmers' cooperative marketing or purchasing associations, or the members thereof, for the purpose of financing the ordinary crop operations of such members or other producers are also exempt, provided the marketing or purchasing association is exempt under section 103 (12) (see paragraphs (a) and (b) of this article), and the financing corporation is operated in conjunction with the marketing or purchasing association. The provisions of paragraph (a) relating to a reserve or surplus and to capital stock shall also apply to corporations coming under this paragraph.

It is the contention of the respondent that petitioner is not entitled to the exemption because it does not treat its member and nonmember patrons alike, in that, from its yearly savings or profits after declaring and paying dividends on its capital stock, it declares and pays a patronage dividend to its stockholder patrons, but does not declare or pay a patronage dividend to nonmember patrons. The savings or profits resulting from the sale of the products of the nonmember patrons were placed in a reserve or sinking fund against which from time to time stock dividends were issued and cash dividends of 8 percent thereon paid to the stockholders in addition to the cash dividend of 8 percent paid on their original stock and investment.

The petitioner was incorporated in 1913 under the general incorporation laws of Iowa for the purpose of buying and selling cream and all dairy products, the manufacture of butter and ice cream, and buying and selling hogs and poultry products.

The authorized capital stock of the petitioner is $50,000, of the par value of $10 per share. It was provided that no person should own or have an interest in more than 50 shares, that no shares should be issued except on actual payment in cash therefor, and that no shareholder should have more than one vote in conducting corporate affairs. The bylaws provided that any practical farmer or dairyman could become a member by the purchase of one share of stock, and that an account with the shareholders should be taken once a year and if the business warranted, a dividend or interest of 8 percent should be paid on each share, and if there was a deficit each shareholder should be assessed according to the amount of business transacted with the corporation. No shareholder was permitted to withdraw from the funds of the corporation any of the accrued

profits on his shares except upon a vote of the directors declaring a dividend. Buttermilk from the creamery was to be fed to hogs, if possible, otherwise to be sold, and the profit from hogs and buttermilk was to be paid to shareholders pro rata to the amount of butter fat furnished. Upon dissolution of the corporation the assets, after payment of liabilities, were to be divided among the shareholders in proportion to their shares of paid-up stock.

The petitioner operates a creamery at Sioux Center, Iowa. It sends out trucks through contiguous territory, which collect the cream from member and nonmember patrons. There were about 1,300 of the former and 200 of the latter during the taxable year. The cream is brought into the creamery, tested for butter fat, manufactured into butter, and sold principally in the eastern markets. The buttermilk is dried and sold in powdered form.

No distinction is made between member and nonmember patrons in the collection of the cream, its testing, manufacture, or in the price paid or advanced therefor. The price or advancement is fixed by the manager every two weeks according to the price on the New York market, and both member and nonmember patrons are paid or advanced such a sum below the New York market as will constitute a safe margin for the transaction of the business.

At the end of each year, after the payment of the necessary marketing expenses, the net profits are divided as follows: First, a dividend of 8 percent is declared and paid on the outstanding capital stock; second, a patronage dividend is declared and paid to stockholder members, based on the amount of butter fat furnished by each; third, the balance, which represents the amount of savings or profits resulting from the products furnished by the nonmember producers, is not paid or credited to them, but is credited to a sinking fund account, which is nothing but a reserve or earned surplus.

In the taxable year petitioner had a net income or savings of $34,025.97, which it disposed of as follows:

Dividend on capital stock_____ $3,939.02
Patronage dividend to stockholders_____ 24,966.80
Profits on nonmembers' business credited to sinking fund_____ 4,756.02
Percentage adjustment to sinking fund_____ 364.13

The item of percentage adjustment of $364.13 represented the odd percentage on stockholders' patronage dividends, thus, in the taxable year the patronage dividend to which members were entitled was 3.94 percent. They were paid 3.9 percent and the odd percentage of .04 percent, amounting to $364.13, was carried into the sinking fund, whereas the entire 3.94 percent, amounting to $4,756.02 profits resulting from the business of nonmembers, was carried into the sinking fund and no nonmember was paid or credited with any amount there-

for. The 1,300 members contributed $364.13 to the sinking fund during the taxable year and the 200 nonmembers contributed $4,756.02. The business for the year amounted to $762,446.17, of which the member business was $640,496.92, being 84 percent of the whole, and the nonmember business was $121,949.25, being 16 percent.

The petitioner has never paid or credited patronage dividends to a nonmember, and it is the policy of the company that no patron can participate in its profits or savings until after he becomes a stockholder, and then only as to profits accruing thereafter. On December 31, 1930, the outstanding capital stock of the petitioner was $45,680, of which $27,140 represented stock dividends for which the stockholders paid nothing, issued in the following manner: January 1, 1926, there was in the sinking fund $16,693.19, which had been accumulated from savings on nonmember business. On January 31, 1925, at a stockholders' meeting a motion was made and carried " to divide part of sinking fund to shareholders, same to be paid out in shares and to give three-fourths share additional stock on every share owned." This was done in 1926 by .the issuance of $11,782.50 in stock dividends, and charged against the sinking fund.

The balance in the sinking fund account January 1, 1929, was $28,146.86. On January 14, 1928, the directors " moved and seconded to pay dividend to shareholders and non-shareholder profits to be put in sinking fund."

On January 12, 1929, at a meeting of the directors, the following was adopted:

Moved and seconded that profit for year 1928 be declared a dividend and non-shareholders profit be put in sinking fund. Motion carried. Moved and seconded to declare a stock dividend of half a share on a share to be taken out of the sinking fund and pay interest on dividend [sic] profits for ensuing year.

These resolutions were carried out in 1929 by the issuance of $15,440 in stock dividends, which was charged against the sinking fund. In every year since the issue of the stock dividends the stockholders have received a dividend of 8 percent on their original investment and also 8 percent on the stock dividends.

On December 31, 1930, there was $23,917.87 in the sinking fund and petitioner's assets were of the value of $73,413.26, with practically no liabilities to creditors. It started operations in 1913 in a small way. In 1930, the taxable year, it did business for 1,500 producers and made sales to the amount of $810,624.19, approximately 3,000,000 pounds of butter.

It seeks to justify the accumulation of the sinking fund or surplus on the ground that its manufacturing plant is too small and its machinery needs replacement, and that, in order to manufacture eco-

nomically and meet competition, it must have larger quarters and new, improved machinery, and that the sinking fund is for that purpose, or some other emergency. Informal discussion has taken place among the officers on the subject, but nothing has been done except the purchase of two small lots of ground in 1926 for $1,000.

At the time petitioner was organized there was no special law in Iowa relative to the organization of a cooperative corporation or association, but from 1915 to the present Iowa has had such statutes. Petitioner seeks to bring itself within these statutes and benefits, if any, but it has failed to show that it has accepted the cooperative law by formal action of the corporation, as required by section 8481, Iowa Code, 1927, 1931. But whether it has accepted and is governed by the Iowa laws referred to is immaterial, as we are governed in this case by the Federal income tax laws.

It is the settled doctrine of the courts and this Board that a taxpayer claiming an exemption from taxation must bring himself strictly within the law allowing such exemption. *Register* v. *Commissioner*, 69 Fed. (2d) 607; *Producers Creamery Co.* v. *United States*, 55 Fed. (2d) 104; *Bank of Commerce* v. *State of Tennessee*, 161 U. S. 134; *Heiner* v. *Colonial Trust Co.*, 275 U. S. 232; *Riverdale Co-operative Creamery Assn.* v. *Commissioner*, 48 Fed. (2d) 711.

In order to be entitled to the exemption the claimant should be, first, organized and operated on a cooperative basis; second, organized and operated for the purpose of marketing the products of members or other producers, and turning back to them the proceeds of sales, less the necessary marketing expenses, on the basis of either the quantity or the value of the products furnished by them; third, it must show that the dividend on its capital stock does not exceed 8 percent on the value of the consideration for which the stock was issued; fourth, it must show that it has not accumulated an excessive or unnecessary reserve.

This petitioner has failed to qualify for the exemption, as it has plainly violated some of these requirements.

Equality of treatment to all of the producer patrons, members, and nonmembers is essential.

In *Central Co-operative Oil Association*, 32 B. T. A. 359, we had before us a purchasing cooperative association which claimed an exemption for the year 1930 under section 103 (12) of the Revenue Act of 1928. It bought and sold gasoline for its members and others, including transients. At the end of the year it divided among its patrons, who could prove their purchases, the share of its profits attributable to their purchases, and the balance, attributable to nonmember business or to those who had failed to prove their purchases, was deemed and accounted for as undivided profits. We held that " obviously

some patrons, local as well as tourists and transients, paid a profit to petitioner, which, under the scheme, was not returned to them, while other members and patrons received the benefits of such profit." The exemption was denied.

The case of *Riverdale Co-operative Creamery Assn.* v. *Commissioner*, 48 Fed. (2d) 711, affirming 18 B. T. A. 1159, was a case of a dairy association arising under the Acts of 1918 and 1921. The taxpayer had capital stock and, after paying a dividend of 8 percent thereon, the balance above operating expenses was turned into a sinking fund or reserve to pay the indebtedness of the association, the cost of the plant and equipment in which nonmembers had no interest. The court there said in part:

* * * And, taking the statutes as our guide, we are of opinion that the exemptions claimed cannot be allowed, because the petitioner was not organized and operated during the years in question as a sales agent for the purpose of marketing the products of its members, and more especially because it did not turn back to its members and producers the proceeds of sales less necessary selling expenses. In addition to necessary selling expenses, there was deducted or reserved from the proceeds of sales a sinking fund sufficient to retire the indebtedness of the petitioner, to provide for the erection of buildings and facilities required in the business, and for the purchase and installation of machinery and equipment. From this reserve there has developed a plant of considerable value, which belongs exclusively to the petitioner and its members. Expenses incurred for such purposes do not, in our opinion, fall within any reasonable definition of the term necessary selling expenses.

In *Producers Creamery Co.* v. *United States*, 55 Fed. (2d) 104, the taxpayer was in the business of marketing milk. It purchased milk from both stockholders and nonstockholders. It paid the stockholders the regular market price plus a bonus on milk brought in up to 10 gallons per day for each $100 of stock owned. To nonstockholder patrons it paid the regular market price without bonus. After quoting the requirement that the proceeds of sales, less necessary marketing expenses, must be distributed among the producers on the basis of the quantity of milk or butter fat in the milk, the court in that case said:

Appellant does not distribute the proceeds less expenses among the producers with whom it deals in this way. It does not distribute them in any way to 30% of its producer customers (non-stockholders). These get no bonuses, are entitled to no dividends, have no interest in the company.

In holding that the corporation was not exempt the court said:

It is plain, therefore, that appellant was not in 1924 either under the terms of the statute standing alone, or, as liberalized by the regulations, a cooperative association as contemplated in the act. *South Carolina Produce Ass'n.* v. *Commissioner*, (C. C. A.) 50 F. (2d) 742. We think it equally clear that it was not exempt under the 1926 Act. This act does expressly extend the exemption

to corporations having a capital stock, paying dividends on the stock, and accumulating a reserve, and does specifically provide that such an association may market the products of non-members to the extent of 50 per cent. of its business. It, however, just as the 1924 statute does, bases the tax exemption upon the fact that the association is organized to, and in operation does, turn back to those for whom it markets their produce the proceeds of the sales, less operating costs. Here the undisputed proof shows that appellant makes at least 30 per cent. of its profit from non-members to whom it turns nothing back.

In *Fruit Growers' Supply Co.* v. *Commissioner*, 56 Fed. (2d) 90, affirming 21 B. T. A. 315, the taxpayer was a fruit growers' sales association, and also acted as a purchasing agent and manufacturer of shook for crating fruit. After furnishing its members it sold the excess to nonmembers, to whom it paid no patronage dividends. It was held that the profits or savings on the nonmember business constituted profit to the association or its members and that such association was not entitled to exemption on the income from supplies sold nonmembers. See also *Burr Creamery Corporation*, 23 B. T. A. 1007; 62 Fed. (2d) 407; *South Carolina Produce Association*, 19 B. T. A. 1028; 50 Fed. (2d) 742.

The act expressly provides:

Exemption shall not be denied any such association because it has capital stock, if the dividend rate of such stock is fixed at not to exceed the legal rate of interest in the state of incorporation or 8 per centum per annum, which- ever is greater, on the value of the consideration for which the stock was issued.

Article 3 of the petitioner's articles of incorporation provides: " and no shares shall be issued to anyone except on actual payment in cash therefor."

Admittedly, in this case $27,140 of the outstanding capital stock of $45,680 was issued as stock dividends and the shareholders paid nothing therefor. This fact alone bars the petitioner from claiming exemption from income tax; for after the declaration of the stock dividends, the stockholders were receiving from 12 to 18 percent per annum on the amounts invested by them.

Relative to the right to accumulate and maintain a reserve required by state law or for any necessary purpose, it is sufficient to say that it used its reserve for an entirely different purpose. A part of it was capitalized in the form of stock dividends upon which dividends were paid at the rate of 8 percent per annum.

Petitioner relies mainly upon the case of *Farmers Union State Exchange*, 30 B. T. A. 1051, in support of its right not to turn back to nonmembers the profits resulting from their business, but to turn it into a sinking fund or reserve.

The facts in that case, however, are considerably different from those in the instant case. There one of the activities of the State Union, a cooperative, was the operation of livestock commission houses for the benefit of its members, but they also marketed livestock and received commissions from nonmembers. All patrons were treated alike except that a nonmember patron was not entitled to receive, and did not receive any patronage dividend until he had qualified as a member of the State Union. Upon becoming a member, his patronage dividend was paid him. We there said:

> Although the livestock commissions were operated and originally financed by the Union for its members, no part of the undistributed earnings of the commissions inured to the benefit of the Union.
>
> If the question before us were whether the three livestock commissions are such cooperative sales agents as are exempt from tax under the statutes, they would meet the test prescribed. From about 82 to 90 percent of the net earnings of the livestock commissions was distributed to the patrons each year on a proportionate basis. The undistributed earnings of the livestock commissions were small in proportion to the business done and were certainly no more than were necessary to be reserved for the exigencies of the business. The business with nonmembers was negligible, and upon the nonmember patron becoming a member he received his patronage dividend. The retention of such a small proportion of the savings would not be sufficient to destroy the exempt status of a cooperative sales agent. The operation of the commissions by the Union did not have the effect of taking the Union out of the exempt class.

It will be observed that in that case it was expressly shown and held that the dividends withheld from the nonmember patrons did not inure to the benefit of the State Union or its members. It was further held that the withheld dividends would be paid to the nonmember whenever he qualified as a member. There was no question in that case of the issuance of stock dividends and payment of interest or dividends thereon in excess of 8 percent, and, instead of holding the nonmember patronage dividends to be delivered to him on qualification, the petitioner's policy and practice was not to pay a nonmember such accrued dividends when he became a stockholder.

We conclude that petitioner is not entitled to the exemption.

*Decision will be entered for the respondent.*