Wholesale Grocers Exchange, Inc. v. Commissioner.
Wholesale Grocers Exch., Inc. v. Commissioner
Docket No. 3104.
United States Tax Court
1944 Tax Ct. Memo LEXIS 180; 3 T.C.M. (CCH) 699; T.C.M. (RIA) 44234; July 18, 1944
*180 Robert J. Heberle, Esq., for the petitioner. Lloyd W. Creason, Esq., for the respondent. STERNHAGEN Findings of Fact and Memorandum Opinion The Commissioner determined deficiencies for 1939, 1940 and 1941, of $690.23, $925.68 and $1,237.71, in income tax, and of $505.91, $642.74 and $602.73, in declared value excess profits tax. The petitioner claims exemption under Section 101(7), Internal Revenue Code, or, in the alternative, the deduction as patronage dividends of distributions to its members. Findings of Fact The petitioner was incorporated September 18, 1925, under the laws of Virginia, as a no profit and no capital stock association - "for the collection and dissemination among its members of information helpful in the conduct of their several businesses; said information embracing among other things information concerning new subjects of merchandise, current prices, the state of the market; to render aid and schooling to its members and employees of its members, designated to such members, in the processes of salesmanship, to procure and disseminate among its members literature appertaining to their several businesses; and to afford them lawful aid in the purchase of their *181 supplies, or the exchange of stock or merchandise, and for such other purposes as may be of mutual advantage to its members and helpful to their employees." The certificate of incorporation provides that the affairs shall be conducted by a board of managers; that the membership shall be composed exclusively of wholesale grocers, and that - "Power to make and alter by-laws is hereby conferred upon the Board of Managers of the corporation, the said by-laws being subject to be altered or repealed by the members of such corporation. "The Board of Managers of said corporation shall have authority to appoint all necessary assistants, agents, or teachers and to prescribe their duties and fix their compensation. The members shall appoint a membership committee with such powers as may be conferred upon said Committee, and until so appointed, the Board of Managers shall be a membership committee and no eligible shall be allowed to join the corporation until, and unless he, or it, shall have received the unanimous endorsement of the entire membership committee; and by, unanimous vote of said membership committee, the membership of any member may be terminated on notice to such member and *182 after opportunity to be heard, and the decision of said membership committee shall be final, and said committee need not give any reason for its action or vote. All information sent by the corporation to its members, or all information received by said members, from or through said corporation will be received and considered as confidential, and limited strictly to members of said corporation. The members of said corporation in meeting assembled shall have power to make and adopt by-laws, and to provide for annual, or special meetings of the members, and at such meetings a quorum shall consist of a majority of all members present at such meeting. The said corporation may, by, by-laws provide for such dues or assessments to be paid by its members, as may seem reasonable, and shall have all the powers granted to such corporation by the general law of the State of Virginia applicable thereto, and may provide for the office, or offices, of one or more Vice-Presidents." The by-laws provide, in part - "The services and activities of the Exchange shall be exercised solely for and on behalf of members of the Exchange, unless the Board of Managers, in exceptional instances, deem it wise *183 to do otherwise. "All prices, or other information, secured through the Exchange must be considered confidential among the members of the Exchange and not be given under any circumstances to any competitor, broker, or salesman. * * * * * "An initial membership fee of Fifty ( $50) Dollars is hereby imposed upon all members, and shall be paid into the treasury of the Exchange before any member can participate in the benefits of the Exchange; any surplus in the treasury at any time may be disbursed at a general meeting of the members in any way and for any purpose a majority of the members present may determine. * * * * *
"Annual dues, or periodic assessment, may be made by the Board of Managers at any time when, in their judgment, the matters of the Exchange require the same." The petitioner owned the copyright on three labels: "Fairfax Hall", "William Byrd" and "Just Suits", under which, after selection by the executive committee, all types of groceries were sold to members. The petitioner protected the three trade names and held meetings once a year at which representatives of the packing houses appeared to acquaint members and their salesmen with the labeled articles. July *184 23, 1936, an "agreement of lease" was made with Hugh P. Powell, who had been manager of petitioner and who desired to begin a general brokerage business. To Powell was "leased" the sole and exclusive right to use the three labels or any of them for $500 per month beginning June 19, 1936. The sale under and use of the three labels were restricted to members who were to use reasonable efforts through their retailers to promote the sale of the labeled goods; the lease is terminable upon the death of Powell or by him on 30 days' written notice; if the Robinson-Patman Act (Pub. No. 692, 74th Cong., H.R. 8442) were to be declared void or if the Federal Trade Commission decided that petitioner could operate substantially as it had operated prior to passage of the Act, then, upon like notice to Powell, petitioner might terminate the agreement and renew its sole authority over the brands. The agreement was in effect during 1939, 1940 and 1941, and pursuant thereto Powell paid petitioner $6,000 each year. The handling of private labels is very expensive for a small business. The members of petitioner, none of whom were in competitive territories, enjoyed through petitioner the advantages *185 of private labels without the usual expense. Prior to 1936, members made purchases through petitioner. In its income tax returns for 1939, 1940 and 1941, filed in Virginia, the petitioner reported the receipt of $6,000 "for use of Labels and Brands" and deducted $6,001.96, $5,922.99 and $5,988.25, respectively, as "Other deductions authorized by law". In the 1939 return the $6,001.96 was designated in Schedule K as "Advertising" and in the 1940 return the $5,922.99 was explained in Schedule K as "Advertising $5,922.74 and Postage.25". The income or (loss) reported was ($67.96) in 1939, $10.01 in 1940 and ($55.25) in 1941. In determining the deficiencies the Commissioner included in taxable income $5,533.86, $6,109.22 and $5,871.39, which he called "Distributions of profits". Memorandum Opinion STERNHAGEN, Judge: The taxpayer's claim for exemption rests upon Section 101(7), Internal Revenue Code. It claims to be a "Business league * * * not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual". The applicable regulation is Section 29.101(7), Regulations 111. From the evidence, it appears that the taxpayer was *186 not a business league organized and operated for the improvement and maintenance of conditions in the grocery business generally for the community benefit of all engaged in that business, but was operated for the benefit of the particular wholesale grocers who were members of the organization through the exploitation of the three labels and the distribution among the members of the "rents" received from Powell under the so-called "lease". The use of the labels was a distinct competive business advantage to each individual member of the organization. In addition to this competitive advantage in sales, the members apparently received their distributive shares of the organization income, which consisted of the amounts received from Powell for the license to use and control the copyrighted labels. Thus to the individual members inure the profits derived from the copyright and also the economic advantages of the use of the copyrighted labels. These are enough to preclude a finding that no part of the profits or net earnings inure to the benefit of any private shareholder or individual. Underwriters' Laboratories, Inc., 46 BTA 464, 475; Retailers Credit Ass'n of Alameda County v. Commissioner, 90 Fed. (2d) 47; *187 Produce Exchange Stock Clearing Ass'n, 71 Fed. (2d) 142. This case is distinguishable from the two cases upon which the taxpayer relies. In Commissioner v. Chicago Graphic Arts Federation, Inc., 128 Fed. (2d) 424, the purpose of the organization was to promote the welfare of the printing industry; its principal revenue was from dues, and its other revenue, from waste paper sales, was but incidental. The Court held that its character as a business league was determined by its general activities to promote better conditions in the whole industry, and by the fact that it paid no dividends and rendered no special individual service except at cost. In the present case, the organization's only activity is to license the use of its copyrights for $6,000 a year, - a clear business activity. Washington State Apples, Inc., 46 B.T.A. 64, was an organization of the apple growers of the State of Washington, the purpose of which was to promote the welfare of the industry as a whole, and not to serve any of the individual members. It had no surplus and made no distributions. It is clearly distinguishable *188 from the present taxpayer. The Commissioner's determination that petitioner was not exempt under Section 101(7) is sustained. The contention that the distributions to members are deductible as patronage dividends cannot be sustained. There is no evidence upon which findings could be made at variance with the Commissioner's determination, or affirmatively that the distributions in question were patronage dividends. The taxpayer argues hypothetically that if it had purchased labeled products for its members and distributed the discounts ratably to its members, such distributions would be deductible as patronage dividends, citing Midland Cooperative Wholesale, 44 B.T.A. 824, and Fruit Growers Supply Co., 21 B.T.A. 315. We need not consider the argument, for there are no facts in evidence upon which it could be based. The Commissioner's determination disallowing the deductions of $5,533.86 for 1939, $6,109.22 for 1940, and $5,871.39 for 1941, is sustained. Decision will be entered for the respondent.