*Decision will be entered under Rule 50.*

UNDERWRITERS' LABORATORIES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 101684, 104234. Promulgated February 26, 1942.

*Myron M. Cowen, Esq., Pressley R. Baldridge, Esq.,* and *J. C. Halls, Esq.,* for the petitioner.

*Franklin F. Korell, Esq.,* and *Arthur Clark, Esq.,* for the respondent.

OPINION.

ARNOLD: It is contended by petitioner that it is exempt from Federal income and excess profits taxes and surtax on undistributed profits either as a nonprofit corporation organized and operated exclusively for charitable, educational, or scientific purposes or as a business league, no part of the net earnings of which inures to the benefit of any private stockholder or individual. Sec. 101 (6) and (7), Revenue Acts of 1936 and 1938.[1]

[1] SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS.
The following organizations shall be exempt from taxation under this title—
* * * * * * *
(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary or educational purposes, or for the

It is not controlling that the petitioner was organized under the laws of Delaware as a nonprofit corporation, that it represented or aimed to furnish services at cost, and that its charter prohibited the distribution of dividends, *Medical Diagnostic Association*, 42 B. T. A. 610, 615. The actual purposes and functions of the corporation as disclosed by all the evidence are material. *Roche's Beach, Inc.* v. *Commissioner*, 96 Fed. (2d) 776. Each case must stand upon its own facts. "No rigid rule may be established as a gauge." *Retailers Credit Assn. of Alameda County* v. *Commissioner*, 90 Fed. (2d) 47. To qualify as an exempt corporation under the statute, a corporation must be both organized and operated exclusively for the purposes specified in the statute.

We think petitioner was not organized and operated exclusively for charitable, educational, or scientific purposes.

Fire insurance companies were concerned about the hazards and risks assumed under policies of insurance issued by them to their patrons. They formed the National Board of Fire Underwriters in 1866 to promote their general interest. The National Board conducted investigations and research work to reduce hazards and minimize risks. In 1893 fire insurance companies were concerned about additional fire hazard resulting from the installation of electrical lighting systems. Through their representative, the National Board, investigations and research were initiated in Chicago. This led in 1901 to the organization by them through the National Board of the Illinois company, which they financed to the extent of approximately $300,000. This company continued the research work theretofore done by the National Board. They caused petitioner to be organized through the same medium on October 31, 1936, and on November 5, 1936, petitioner acquired the assets and assumed the liabilities of the Illinois company and carried on the research work theretofore carried on by the National Board and later by the Illinois company. Petitioner was managed and controlled by 15 trustees, all of whom except two, the president and general manager of the National Board, are officers of stock fire insurance companies. Voting control is vested in the representative of stock fire insurance companies, the National Board.

The trustees had the power, under petitioner's bylaws, to levy an assessment for dues and fix the amount thereof to be paid by each regular member other than the National Board, and it was to pay

---

prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation ;

(7) Business leagues, chambers of commerce, real-estate boards, or boards of trade, not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual.

as many times that amount as it had members at the date of the last annual meeting. It was not necessary, however, to levy assessments to carry on the work of petitioner as petitioner's receipts from other sources not only paid its operating costs but resulted in a profit and the accumulation of a large surplus.

The petitioner entered into contracts for the testing, inspection, and label services with manufacturers only. Manufacturers are in business for profit and do not usually enter into contracts involving the expenditure of considerable money without some expected return. This is particularly true as to manufacturers which had testing laboratories of their own and to whom a contract with petitioner meant a duplication of expense. It is a matter of common knowledge that many manufacturing concerns operate testing laboratories in conjunction with and as a part of the business enterprise. The chief concern of manufacturers is a purchasing public. The publications issued by petitioner, its radio programs, and its motion picture films, while educational to a certain extent, also explain and emphasize the significance of petitioner's labels and call attention, directly or indirectly, to the products inspected and approved by it and to the manufacturers of such products. The president of petitioner testified that it invited a wide distribution of the lists of inspected and approved products without cost as a part of its service. These lists and the publications were widely distributed. Their picture films are in constant circulation. The efficiency of the testing and inspection work of the petitioner was made known to the general public in order to inculcate a feeling of confidence in petitioner's labels appearing on manufactured products offered for sale to the public. It created a sales appeal for the articles bearing its labels. These activities made petitioner's contracts attractive to manufacturers. It is to be noted that petitioner, in its pamphlet "Testing for Safety", distributed in particular to manufacturers to be read prior to the signing of an application for examination, test, report, and listing, states in part as follows:

The long experience and methods employed for keeping in close touch with manufacturers, users, inspection authorities, and other similar sources of practical information have resulted in a wide recognition of the standards and recommendations of Underwriters' Laboratories, Inc.

\*       \*       \*       \*       \*       \*       \*

The majority of underwriters in the United States, and many federal, state, and municipal authorities, plant operators, and architects, building owners and users either accept or require listing by Underwriters' Laboratories, Inc., as a condition of their recognition of devices, systems, and materials having a bearing upon life and fire hazards, and upon theft and accident prevention.

Petitioner in other ways solicited business from manufacturers.

The petitioner was authorized to and did carry on scientific investigations, study, experiments, and tests to determine the relation of

various materials and devices to life, fire, crime, and casualty hazards. The employment of scientific methods was inherent in the services it contracted to perform for manufacturers. Scientific methods were essential to the proper performance of its contractual obligations. Except in a few instances the testing services were rendered to manufacturers only. The inspection and label service were given to manufacturers only. These services were not performed gratuitously, they were performed for a money consideration. The manufacturers were not members of petitioner. Their relations with petitioner were upon a strictly business basis. All manufacturers were required to pay for the tests made, whether or not they resulted in the approval of the product tested. Factory inspection and label services required the payment of an additional charge. The right to listings and labels was forfeited immediately upon failure to pay the required fees to petitioner. The petitioner made refunds to its label service clients aggregating $80,834.36 in 1937 and $25,303.43 in 1938. These amounts were not included in gross income. The refunds were made upon recommendation to and with the approval of the board of trustees. Notwithstanding such refunds, petitioner realized very substantial profits. The refunds made in 1937 amounted to about one-third of its net income for that year, and in 1938 amounted to only about one-fifth of its net income for that year, inclusive of the refunds. The record fails to disclose why the entire profits were not refunded or the reason for the retention and accumulation of the remaining substantial profits, which, except for a comparatively small amount, were derived from its contracts with manufacturers. When the petitioner took over the research work conducted by the Illinois company it acquired that company's accumulated operating surplus in excess of $1,000,000. Its personnel was also taken over by petitioner. The petitioner had therefore a background of extensive operating experience. Above petitioner's name in all its publications the following appears: "Founded in 1894." In other ways it called attention to its many years of operation and experience. Undoubtedly it could have established prices which would not have resulted in such substantial profits. Not having done so, it is reasonable to assume that it intended to operate for profit. *West Side Tennis Club*, 39 B. T. A. 149, affd., 111 Fed. (2d) 6; certiorari denied, 311 U. S. 674. Its operation as a commercial enterprise was within the powers enumerated in its charter as follows: "To contract with manufacturers and others for the examination, classification, testing and inspection of buildings, materials, devices and methods with reference to life, fire and casualty hazards, appurtenances thereto or the use thereof." Its so-called educational work, its scientific activities, and even its so-called charitable work, the purpose of which was to keep trained and efficient personnel in its employment, all made petitioner's contracts of value to manufacturers and

were necessary and essential in the proper performance of its contracts and its continued successful operation. From one of its radio interviews contained in a "Bulletin of Education" it appears that petitioner had about 3,000 manufacturers under contract which operated more than 4,000 factories in all parts of the country and represented more than one hundred industries, and that such manufacturers submitted over 200,000 articles to the petitioner. Its list, published May 1939, of inspected electrical equipment alone is contained in a volume approximately six by nine inches in size containing 430 pages. Its testing activity other than for manufacturers was infinitesimal as compared with the work done for manufacturers. It conducted some tests and research in collaboration with the Federal Bureau of Standards. This work was incidental and much of it pertinent to its work for manufacturers.

It claimed that no part of petitioner's net earnings inured to the benefit of any private shareholder or individual. The petitioner's charter provides that no distribution of any of its property or income shall be made to its members by way of dividends or distributions in liquidation or otherwise. "Profits may inure to the benefit of shareholders in other ways than in dividends." *Northwestern Municipal Assn., Inc.* v. *United States*, 99 Fed. (2d) 460. In *Northwestern Jobbers' Credit Bureau* v. *Commissioner*, 37 Fed. (2d) 880, affirming 14 B. T. A. 362, the court, after reviewing the services rendered by the bureau to its shareholders and other individuals, which services were reasonably necessary to the proper conduct of their business, stated: "To the extent that they [services] are provided at the cost of appellant [the bureau] and not compensated for by the recipients, they are a burden and loss to the net profits accrued and accruing to appellant. The net earnings of appellant in this way inure to the benefit of its shareholders and to private individuals." To the same effect, see *Adjustment Bureau of St. Louis Association of Creditmen*, 21 B. T. A. 232. The following stated in *Durham Merchant's Association* v. *United States*, 34 Fed. Supp. 71, is apposite here:

* * * It cannot be successfully maintained that this is a company whose net earnings do not inure to the benefit of private individuals because it has no capital stock and stockholders. Undoubtedly the growth and success of the enterprise render its usefulness greater to each of its membership. If its profits are used to expand and enlarge its activities, its members profit thereby. And this increased service and activity inures to the profit of its members.

It is not controlling that petitioner did not distribute its profits to its members. *Berkeley Hall School, Inc.*, 31 B. T. A. 1116; affd., 84 Fed. (2d) 539. Article 101–1 of Regulations 94 and 101 and corresponding articles in prior regulations provide that the words "private shareholder or individual" refer to "individuals having a

personal and private interest in the activities of the corporation." The words "private individual" used in the statute are "broad enough to embrace private corporations, as well as natural persons." *Louisville Credit Men's Adjustment Bureau* v. *United States*, 6 Fed. Supp. 196.

The members of petitioner received the card system classifying the products tested and the annual lists and supplements thereto of manufacturers and their products approved by petitioner and subject to its inspection service and other publications. The cost of these publications were a part of the operating cost of the petitioner which was paid for by the manufacturers and not the members. Obviously the work of petitioner, the results of which were communicated to its members by means of its publications and otherwise, relieved them of making such tests in their own behalf and were of great benefit to them and saved them considerable expense and effort. As stated in *Produce Exchange Stock Clearing Association, Inc.* v. *Helvering*, 71 Fed. (2d) 142, no reason "is apparent for exempting an association which merely serves each member as a convenience or economy in his business." The information given to members was related and germane to their own business endeavors. Most of the members, because of their business interests, received a peculiar and additional benefit which was different from that received by the public in general. Although a reduction in rates for fire insurance resulted from the activities of petitioner and its predecessors, such reduction undoubtedly led to an increased volume of business and thereby greater earnings for the insurance companies. Through their membership in the National Board they managed and controlled the petitioner, since the National Board had a vote for each of its members. If petitioner's operations were not for the special benefit of the insurance companies involved, it is not likely that they would have financed the National Board originally in doing research work of the character involved and would not have obligated themselves to pay assessments and dues to defray petitioner's operating expenses when that activity was taken over by petitioner, particularly since the National Board was retained to promote their interests generally. They were benefited even more by the activities of petitioner than by its predecessors, since the activities originally carried on by the National Board had grown into a large and profitable enterprise wholly supported by revenue from other sources, thus giving them the benefit of petitioner's investigation and research without cost. Petitioner's charter implies that the members had a personal and private interest. It provides that in case of expulsion, death or resignation the members' interest "in the corporation, its assets or property or the use and application thereof" terminates. Under the circumstances here, it can not be

said that the earnings of petitioner did not inure to the benefit of any of petitioner's members, even though they were not distributed. *Retailers Credit Association of Alameda County, supra.*

The petitioner argues that the term "charitable" clearly comprehends the establishment and maintenance of its pension and disability fund. It is not sufficient that the activities of petitioner may be classified as charitable in the broad sense that they tend to promote the well-doing and well-being of social men. See *Ould* v. *Washington Hospital for Foundlings*, 95 U. S. 303, cited by petitioner, which so defines a charitable use. Furthermore, this fund was not established by petitioner. It was established by the Illinois company. The petitioner since its organization in 1936 contributed a portion of the amount necessary for the maintenance of the pension plan. This is no more than many organizations engaged in business for profits are doing and it is not generally considered a charity. Cf. *Harrison* v. *Barker Annuity Fund*, 90 Fed. (2d) 286; and *Young Men's Christian Association Retirement Fund, Inc.*, 18 B. T. A. 139, which are distinguishable on the facts. It is done not only as a protection for the employees, but more particularly as an inducement to trained and efficient employees to continue in their employment. It is in the nature of compensation for services rather than charity. That the pension plan was originally proposed as a means of reducing the constantly increasing number of men who had been trained by the Illinois company from leaving their employment with that company appears from the "Chronological listing of the Pension Plan", petitioner's exhibit numbered 92. Thus the pension plan was an aid to its business, an outgrowth of a business necessity rather than a charitable intent or purpose. Even if considered as charitable, it was merely incidental to its main purpose.

The petitioner relies upon *Trinidad* v. *Sagrada Orden de Predicadores*, 263 U. S. 578. In that case the corporation derived a substantial amount of income from rents, dividends, and interest from real estate and securities and from sales of wine, chocolate, and other articles. However, it was stipulated therein that the corporation was both organized and operated for religious, charitable, and educational purposes, that none of its income was applied to the benefit of any stockholder or individual member, and that all of its income was devoted to the purposes for which it was organized. The Court held that in view of the stipulated facts and in particular the stipulated fact that all of the income was devoted to the purposes for which the corporation was organized, it was not engaging in a business pursuit in using the properties to produce income to carry out its purposes. In that case the essential requirements of the statute for exemption were stipulated in taxpayer's favor. That case is distinguishable on its facts.

It is true that the public received benefits by the elimination of certain hazards and resulting safety. That is the general effect of science, discovery, and invention, but statutory exemption of business concerns engaged therein and profiting therefrom is not justified on the ground that the public shares in the benefits resulting therefrom. The users of approved appliances forming a large part of the public ultimately paid for the benefits they receive, as the cost of petitioner's services to manufacturers was reflected in the price of the appliances.

The evidence shows that the Commissioner of Internal Revenue advised the National Board in a letter dated January 10, 1940, that it was exempt from Federal income tax under section 101 (7) of the Revenue Act of 1938 and the corresponding provisions of prior revenue acts. The mere fact that the National Board, an exempt organization, controlled the petitioner by reason of its voting rights does not determine the status of petitioner under section 101 (6) and (7). See *Sand Spring Railway Co.*, 21 B. T. A. 1291. The petitioner was not "organized and operated exclusively to feed" the National Board. See *Roche's Beach, Inc.* v. *Commissioner, supra*, in which a corporation engaged in business for profit was held exempt because it was organized and operated as a medium through which an exempt charitable foundation could operate, all its profits being used for the charitable purpose of the foundation. The general manager of the National Board testified that the National Board received its revenue from assessments on its membership and from subscriptions from nonmembers and that on several occasions when the petitioner rendered services to it, petitioner was compensated and paid therefor, it being understood that the services were rendered upon a cost basis. Hence the National Board used none of the profits of petitioner for its purpose as an exempt corporation.

The petitioner was a "business league" in the sense that its members had a common interest, but that is not sufficient to entitle it to exemption from tax under section 101 (7) of the Revenue Acts of 1936 and 1938. *Retailers Credit Association* v. *Commissioner, supra; Northwestern Municipal Association, Inc.* v. *United States, supra*. In order to be exempt no part of its net earnings may inure to the benefit of private shareholders or individuals. "Its activities should be directed to the improvement of business conditions in one or more lines of business as distinguished from the performance of particular services for individual persons"; and it should not "engage in a regular business of a kind ordinarily carried on for profit even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining." Art. 101 (7)–1, Regulations 94 and 101. As heretofore stated, in our opinion, a part of petitioner's net earnings inured to the benefit of private shareholders and individuals. It

was also engaged in a regular business of a kind ordinarily carried on for profit. *Fort Worth Grain & Cotton Exchange*, 27 B. T. A. 983. The operation of its laboratories for manufacturers was its principal activity. It is therefore not a "business league" exempt from taxation within the meaning of section 101 (7) of the Revenue Acts of 1936 and 1938. Art. 101 (7)–1, Regulations 94 and 101; *Northwestern Jobbers' Credit Bureau* v. *Commissioner*, 37 Fed. (2d) 880; *Retailers Credit Association* v. *Commissioner, supra; Northwestern Municipal Association, Inc.* v. *United States, supra.*

The remaining question to be determined is whether the petitioner is entitled to the deduction of $39,497.36 as an ordinary and necessary expense paid or incurred by it during the period from November 5 to December 31, 1936, under section 23 (a) of the Revenue Act of 1936.

The Illinois company paid $463,144.36 to the Equitable Life Assurance Society of the United States for the purchase of pension and disability policies of insurance for the benefit of its officers and employees, effective as of January 1, 1936. Subsequently it was determined that the premium cost of such policies was only $412,063.24. The Illinois company therefore had overpaid the premium and was entitled to a credit in the amount of such overpayment. Thereafter, and on or before September 25, 1936, the Illinois company and the insurance company agreed to the application as of October 1, 1936, of $39,497.36 of such credit to the purchase of additional annuity benefits for a certain class of employees of the Illinois company. The petitioner was incorporated on October 31, 1936, and it acquired the assets and assumed the liabilities of the Illinois company on November 5, 1936. Obviously the $39,497.36 had been paid by the Illinois company and applied by the insurance company to the supplemental contract prior to the existence of the petitioner. The expense of the supplemental contract was therefore neither incurred nor paid by the petitioner.

It was stipulated that the additional insurance contract was delivered to the petitioner sometime after November 5, 1936, and that on December 8, 1936, the petitioner agreed that this $39,497.36 was to be credited to premium annuity for approximately 140 of its employees. The contention of petitioner, based upon such stipulation, that the supplemental contract was not definitely consummated until December 8, 1936, and that the transaction was clearly one between the petitioner and the insurance company, is untenable. Apparently the organization of the petitioner and its acquisition of the assets of the Illinois company effected no change in the personnel or the nature of the business as conducted by the Illinois company. In one of the pamphlets issued August 1937 by petitioner, setting forth the

nature of its organization and service to and cost thereof to manufacturers, it is stated as follows:

UNDERWRITERS LABORATORIES, INC., charged as a non-profit organization without capital stock, under the laws of the State of Delaware, was established to maintain and operate laboratories for the examination and testing of devices, systems and materials. Founded in 1894, the enterprise is sponsored by the National Board of Fire Underwriters, and is operated for service, not for profit.

Nevertheless the petitioner was legally an entity separate and distinct from the Illinois company. *Cannon Manufacturing Co.* v. *Cudahy Packing Co.*, 267 U. S. 333; *Peterson* v. *Chicago, Rock Island & Pacific Railway Co.*, 205 U. S. 364. The mere fact that the supplemental contract was delivered to petitioner and it agreed to accept it is not determinative of the question involved, since the liabiliy for the premium thereof had been incurred and paid prior to the existence of petitioner. Furthermore, since the petitioner agreed to assume all the liabilities of the Illinois company and since it took over the employees of the Illinois company to whom the supplemental contract applied, it followed as a matter of course that petitioner indicate in some formal way its acceptance, not only of the supplemental contract, but of the original contract as well.

It is alleged in the petition, but denied by respondent, that among the assets of the Illinois company taken over by the petitioner there was a credit balance with the insurance company of $39,497.36. There is no evidence as to the nature or character of the assets of the Illinois company acquired by the petitioner except that the principal assets consisted of cash, invesments, and plant and equipment. It does appear, however, that the Illinois company definitely agreed to the application of $39,497.36 of the overpayment credit with the insurance company to the supplemental contract. A liability of the Illinois company for the payment of the premium therefor was created. Whether or not such liability was set up on the books of the Illinois company or offset against its overpayment credit is immaterial. Even if petitioner had paid the premium by an offset against the credit it alleges to have received as an asset, it is not entitled to the deduction. The payment of a liability assumed upon the acquisition of assets is a capital expenditure and is not deductible as an expense of doing business. *Athol Manufacturing Co.*, 22 B. T. A. 105; affd., 54 Fed. (2d) 230; *Caldwell & Co.*, 26 B. T. A. 790; affirmed without opinion, 65 Fed. (2d) 1012.

The action of respondent in disallowing the claimed deduction of $39,497.36 is approved.

Reviewed by the Board.

*Decision will be entered for the respondent.*

STERNHAGEN and MELLOTT concur only in the result.

MURDOCK, dissenting: I am impressed by the broad, general public service rendered by this corporation. It was organized by the National Board, itself an exempt corporation. The organization and operation of the petitioner was for a combination of educational, scientific, and charitable purposes. It was charitable, in the broad sense of that term, since it tended to promote the well-doing and well-being of social man. *Ould* v. *Washington Hospital*, 95 U. S. 303. The word "charitable" is used in the act in its broadest sense and includes scientific and educational activities. *United States* v. *Proprietors of Social Law Library*, 102 Fed. (2d) 481. Exemption is granted in recognition of the benefit derived by the public and is intended to aid the exempt corporation when it is not conducted for private gain. *Trinidad* v. *Sagrada Orden de Predicadores*, 263 U. S. 578. This corporation was rendering a tremendous service to the public.

The primary purpose of this corporation was to advise and safeguard the public so that hazards to which people and property are subjected would be avoided or minimized. The activities of the petitioner were directed to a very broad purpose, to the investigation and study of the relation of various materials, devices, systems, conditions, etc., to certain life and property hazards, in an effort to ascertain and publish for public use and benefit information that would advise the public how best to avoid or minimize such hazards. That, to my mind, is a charitable purpose. Without that purpose, in fact unless it was successful in that purpose, the petitioner could in nowise serve any other purpose. That is, any benefit which it may have been to the manufacturers or to insurance companies necessarily depended upon the accomplishment of this broad, general purpose of serving the public. Any benefits to manufacturers or insurance companies were purely incidental and not the primary purpose of this corporation. Cf. *Northwestern Municipal Association, Inc.* v. *United States*, 99 Fed. (2d) 460; *Crooks* v. *Kansas City Hay Dealers' Assn.*, 37 Fed. (2d) 83; *Mutual Aid & Benefit Assn.* v. *Commissioner*, 42 Fed. (2d) 619; *Young Men's Christian Association Retirement Fund, Inc.*, 18 B. T. A. 139.

Obviously, the petitioner operated at a profit, but there would be no point to the exemption if the statute did not exempt corporations which operated at a profit. Evidence that a particular corporation made charges for its services which resulted in a large unneeded profit might tend to show that it was organized and operated for profit, but only if the destination of those profits was some private stockholder or individual. *Sand Springs Home*, 6 B. T. A. 198. The petitioner tried to limit its charges for testing to cost, even to the extent of refunding a part of the amount originally collected. This, to me, indicates a corporation not organized for profit rather than otherwise. It took over a large surplus of its predecessor, and about half of that

surplus was used to give its employees some social security. That use of its profits did not take it without the exempting provisions of the statute. The rest of its surplus for the most part was apparently invested in plant and equipment with some reserve funds.

No cash earnings ever inured or could inure to the benefit of any private stockholder or individual. It is said, however, that the profits inure to the benefit of the insurance companies and manufacturers, since they are used in expanding the plant which performs services for the insurance companies and maufacturers for which they would otherwise have to pay. In the first place, there is no evidence to support this argument and I don't think we have a right to speculate that the services performed by the petitioner relieved the members or the manufacturers from "making such tests in their own behalf and were of great benefit to them and saved them considerable expense and effort." The manufacturers were not "private stockholders or individuals" within the meaning of the act. The benefits to insurance companies inured to nonmember insurance companies, the Federal Government, states, municipalities, and the public, as well as to the members. General benefits of that kind are inherent in many cases that arise under this statute and their existence does not defeat the right to exemption. *United States* v. *Proprietors of Social Law Library, supra.* Once the broad, public, and charitable purpose of the petitioner is recognized, the incidental benefits pale into relative insignificance.

It seems quite clear to me that the petitioner was not operated for the benefit of manufacturers. Testing was only one of the services performed by the petitioner. It made many studies which were purely for the benefit of the public, were unrelated to the testing of any articles submitted by manufacturers, and were performed free without any possibility of profit to the petitioner. Furthermore, the testing of articles was done, not to serve the convenience of the manufacturers and as a substitute for testing which they themselves would have done, but to safeguard the public. The petitioner established its own tests for its own purposes. It did not test articles as a mere service to manufacturers to determine the general desirability of the articles or to satisfy the desire of the manufacturer for any particular kind of a test. It was in no sense enployed by the manufacturer and was not under the control of the manufacturer. The latter had no choice in the kind of test made or in the use made of the information obtained from the test. The petitioner tested only for certain hazards of its own selection and for the single purpose of safeguarding the public. The charges for testing were not fixed upon a competitive basis, but upon cost. The labels were designed as a part of the educational system of the petitioner and not as a money making scheme. Commercial labora-

tories might be expected to perform such tests as the manufacturer desired, solely for the purpose of the manufacturer and under some control and direction of the manufacturer. Thus, the petitioner differs materially from any commercial testing laboratory which I can imagine.

I do not think exemption may be denied because of the interest of insurance companies in this petitioner and its activities. It is pretty well insulated from insurance companies by the National Board, which is itself an exempt corporation. No doubt the selfish interests of insurance companies were at least partly responsible for the formation of predecessors of the petitioner, but a broad, charitable purpose is apparent throughout. Exemption should not be denied because insurance companies may reap some incidental benefit from the activities of the petitioner, and it should be borne in mind that those insurance companies which may be represented in some way in the membership of the petitioner receive absolutely no benefits which are not received in equal measure by insurance companies which have no connection whatsoever with the petitioner. This fact distinguishes cases like *Northwestern Municipal Assn., Inc.* v. *United States*, 99 Fed. (2d) 460; *Northwestern Jobbers' Credit Bureau* v. *Commissioner*, 37 Fed. (2d) 880; *Adjustment Bureau of St. Louis Association of Credit Men*, 21 B. T. A. 232; and *Durham Merchant's Assn.* v. *United States*, 34 Fed. Supp. 71. All data obtained by the petitioner are just as readily available to nonmember insurance companies, to public officials, and to the public generally as they are to insurance companies which may happen to have representation in the membership of the petitioner. All services, so far as the public was concerned, were rendered free of charge and were available to all alike, whether members or not. The benefit to the insurance companies is said to be through a reduction of hazards and a consequently lower rate for insurance, which must result in increased business. Is it reasonable to believe that this indirect, remote, and doubtful benefit was the purpose for which the petitioner was organized and operated?

Furthermore, I think the petitioner would be exempt as a business league under section 101 (7) even if it were not exempt under 101 (6). Some of the requirements for exemption under (7) are the same as those for exemption under (6) and need no further discussion here. The majority opinion concedes that the petitioner meets a number of the requirements of a business league and those requirements need no discussion. But it is said that the petitioner is not a business league because it engaged in a regular business of a kind ordinarily carried on for profit. The petitioner has offered some proof to show that it was not engaged in that kind of business and to show that its

nearest counterpart is found in the Bureau of Standards and in the Bureau of Mines, rather than in any commercial laboratory. The respondent says that the petitioner is like many commercial laboratories, but he has failed to offer any proof to show what commercial laboratories do or wherein they are like the petitioner. Furthermore, I have pointed out above a number of particulars in which the activities of this petitioner are shown to be different from those of a commercial nature which are competitive and engaged in for profit. The petitioner was not a competitor and was not offering services designed to meet the desires of manufacturers. Exemption is not to be denied the petitioner because it found a way to become self-supporting and carry on its great public work at the expense of manufacturers who derived an incidental benefit from its activities. There is no evidence that the public paid for the services of the petitioner through higher prices charged for approved and labeled goods. The public derived the chief benefit at no cost whatsoever. It seems to me that the petitioner meets the statutory requirements of a business league and should be exempt from tax, either on that ground or under 101 (6), or under both.

SMITH and LEECH agree with this dissent.