CONSUMERS CREDIT RURAL ELECTRIC COOPERATIVE CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 82879.   Filed October 31, 1961.

*Philip P. Ardery, Esq.*, for the petitioner.
*Arthur Clark, Jr., Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined a deficiency in petitioner's income tax for the year 1957 in the amount of $2,779.58 and in his amended answer respondent claims an additional deficiency of $1,478.41 in petitioner's income tax for 1957. The issues are (1)

whether petitioner is a tax-exempt organization within the meaning of section 501(c)(12); (2) whether certain distributions paid by petitioner to holders of its purported debentures are deductible as interest payments under section 163; and (3) whether petitioner is entitled to a deduction of $3,052.44 claimed by it in 1956 for "Distribution to Members based on Participation," which would affect its net operating loss carryover deduction from 1956 to 1957.

FINDINGS OF FACT.

Some of the facts have been stipulated and they are herein incorporated by this reference.

Consumers Credit Rural Electric Cooperative Corporation, hereinafter called petitioner, is a corporation organized on August 19, 1954, under the laws of Kentucky with its principal office in Louisville, Kentucky. Petitioner filed its corporate income tax returns for the period here involved with the district director of internal revenue for the district of Kentucky.

Petitioner is engaged in the financing of (1) electric appliances and (2) the installation of electrical systems and water and plumbing systems for customers of the rural electric cooperative associations who are members of petitioner. All of the members of petitioner are tax-exempt rural electric cooperative associations engaged in the distribution of electrical energy to residents of the agricultural areas of Kentucky. Representatives of these various rural electric cooperative associations were actively engaged in the organization of the petitioner in 1954. At the time petitioner was organized, three or four of the rural electric cooperative associations had been individually financing such purchases made by their customers.

Petitioner's articles of incorporation provide, in part, as follows:

ARTICLES OF INCORPORATION
OF
CONSUMERS CREDIT RURAL ELECTRIC COOPERATIVE CORPORATION

The incorporators whose names are hereunto signed, being natural persons and citizens of the Commonwealth of Kentucky, have executed these Articles of Incorporation for the purpose of forming a cooperative corporation not organized for pecuniary profit pursuant to the "Rural Electric Cooperative Corporation Act".

ARTICLE I

The name of the Corporation shall be:

CONSUMERS CREDIT RURAL ELECTRIC COOPERATIVE CORPORATION.

ARTICLE II

The purpose or purposes for which the Corporation is formed are as follows: (1) To promote and encourage the fullest possible use of electric energy by Rural Electric Cooperative members in this state. To enhance and expand the pro-

curement and use by Rural Electric Cooperative members of electric household appliances, electric farm equipment and various types of farm electric services, by assisting with the financing of these benefits to the end that the existing electric average load per member of Rural Electric Cooperatives within this state be expanded as much as possible. To perform all services attendant or related to the matters of accounting, billing, crediting, lending, processing loans and other activities associated with the aforementioned purpose of building of rural electric cooperative loads through financing purchases by rural electric cooperative members of electric devices, equipment, fixtures, machinery and supplies.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

At the time of the first meeting of the membership the Corporation shall select the number of Directors, which shall be equal to the number of Rural Electric Cooperative Corporation members of this Corporation, but in no case less than five, each Rural Electric Cooperative Corporation member being entitled to one director. Thereafter, at all times each Cooperative Corporation member shall be represented by one director.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

*Section 1.* The Corporation shall have no capital stock, and the property rights and interests of each member shall be equal.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

*Section 4.* Any member may withdraw from membership upon payment in full of all debts and liabilities of such member to the Corporation and upon compliance with such terms and conditions as the Board of Directors may prescribe.

*Section 5.* Membership in the Corporation and a certificate representing the same shall not be transferable. Upon the cessation of existance [*sic*], expulsion or withdrawal of a member, the membership of such member shall thereupon terminate, and the certificate of membership of such member shall be surrendered forthwith to the corporation. Termination of membership shall not release the member from the debts or liabilities of such member to the corporation.

*Section 6.* Membership in the Corporation shall be evidenced by a certificate of membership which shall be in such form and shall contain such provisions as shall be determined by the Board of Directors, not contrary to or inconsistent with these Articles of Incorporation or the bylaws of the Corporation. Such certificates shall be signed by the president and secretary of the Corporation and shall be sealed with the corporate seal.

*Section 7.* Each member shall be entitled to only one vote in the affairs of the Corporation. At all meetings of the members at which a quorum is present, all questions shall be decided by a vote of the majority of the members represented except as otherwise provided by law, the Articles of Incorporation or bylaws of the Corporation. The vote of each corporate member shall be case [*sic*] by a duly authorized representative who must be a director or manager of such corporate member.

Article VIII, section 2, of petitioner's bylaws provided, in part, as follows:

*Section 2. Patronage Capital.* In the furnishing of goods and/or services the Cooperative's operations shall be so conducted that all patrons, members and non-members alike, will through their patronage furnish capital for the Cooperative. In order to induce patronage and to assure that the Cooperative will operate on a non-profit basis the Cooperative is obligated to account on a patronage

basis to all its patrons for all amounts received and receivable from the furnishing of goods and/or services in excess of operating costs and expenses properly chargeable against the furnishing of goods and/or services. All such amounts in excess of operating costs and expenses at the moment of receipt by the cooperative are received with the understanding that they are furnished by the patrons as capital. The Cooperative is obligated to pay by credits to a capital account for each patron all such amounts in excess of operating costs and expenses. The books and records of the co-operative shall be set up and kept in such a manner that at the end of each fiscal year the amount of capital, if any, so furnished by each patron is clearly reflected and credited in an appropriate record to the capital account of each patron, and the Cooperative shall within a reasonable time after the close of the fiscal year notify each patron of the amount of capital so credited to his account. All such amounts credited to the capital account of any patron shall have the same status as though they had been paid to the patron in cash in pursuance of a legal obligation to do so and the patron had then furnished the Cooperative correspondending [*sic*] amounts for capital.

Petitioner's method of operation was substantially as follows: When a customer of a local member cooperative association desired to finance the purchase of an electrical appliance, or the installation of an electrical system or water or plumbing system, he purchased the appliance from an appliance dealer, or had the system installed or well dug by a contractor. The customer made a downpayment and signed a promissory note and conditional sales contract for the balance of the cost. The dealer or contractor then assigned the promissory note and conditional sales contract to the local member cooperative association, which in turn reassigned the same to the petitioner. The petitioner in turn forwarded the balance due on the purchase or contract either directly to the dealer or contractor, or to the local member cooperative association, which in turn forwarded this amount to the dealer or contractor. Repayments of the promissory notes were made by the customer at interest to the local member cooperative association, which in turn remitted the amounts so collected to the petitioner. Normally, the local member cooperative association included the monthly installment due on the note in its regular monthly billing for electric service which it sent to the customer. Only customers of member rural cooperative associations could participate in this financing operation.

Petitioner derived its operating capital by the issuance of certificates which it designated as "debentures" and from bank loans. The "debentures" were offered for sale only to the various rural electric cooperative associations on a voluntary basis. Petitioner sold "debentures" to at least one rural cooperative which, after a while, withdrew from petitioner's financing operations but kept the "debentures" as an investment. Some rural cooperatives have participated in petitioner's financing operations without purchasing its "debentures." Through an oversight the petitioner sold a few "debentures" to a bank, but when the oversight became apparent, the petitioner called in the "debentures." Petitioner issued both 3-year 3½-percent "debentures"

and 5-year 4-percent "debentures." It is stipulated that "The 'debentures' were specifically subordinated to bank credit, but to no oth 'debts' of the petitioner." The following schedule reflects the amounts of membership fees (members were charged an initial membership fee of $10), bank loans, "debentures," and loans receivable of the petitioner as of December 31 of each of the years 1954 through 1957:

| Year | Membership fees | Bank loans payable | "Debentures" | Loans receivable |
|---|---|---|---|---|
| 1954 | $60 | $161.78 | $30,000 | $30,142.41 |
| 1955 | 130 | 24,532.89 | 407,000 | 444,349.38 |
| 1956 | 140 | 164,948.53 | 555,000 | 736,578.65 |
| 1957 | 140 | 276,200.93 | 580,000 | 874,866.27 |

Most of petitioner's funds were used in its financing operations.

As of the close of 1956 the petitioner's books of account reflected a "net profit" or "net margin" of $3,052.44 after the payment of "interest" on its "debentures." Within 8½ months after the close of 1956 the petitioner allocated this amount among the member cooperative associations on the basis of the dollar volume of loans made through the member cooperatives and considered this allocation as "patronage dividends" or "capital credits." This amount was reflected on the petitioner's books of account in a capital credits account which is similar to a surplus account, and was never actually paid to the member cooperatives. Petitioner excluded this amount from income on its income tax return for 1956 with the explanatory statement "Distribution to Members based on Participation."

Respondent, in computing petitioner's income for 1957, disallowed a deduction for "interest" payments made to the "debenture" holders who were members of petitioner. Respondent made the following explanation in the statutory notice of deficiency:

### Explanation of Adjustments

(a) It has been held that monies paid as interest to holders of debentures who are members of the corporation represent a return of capital and therefore do not constitute an allowable deduction. This determination is based on the fact that no stock has ever been issued, and the debentures do not represent true debts since they are subordinate to all credit extended by banks and are not secured by any property. Computation of the adjustment is as follows:

Deduction claimed _____ $22,496.07
Deduction allowable _____ *485.07

Increase in income _____ $22,011.00

*Interest on debentures sold to a bank which was not a member, and also to one non-member cooperative.

In an amended answer the respondent alleged that in the notice of deficiency he had erroneously determined that the petitioner was entitled to a net operating loss carryover deduction from the year

1956 to the year 1957 in the amount of $4,263.90, and that, instead, the petitioner's net operating loss for the year 1956 allowable as a carry-over to 1957 should be in the amount of $196.03. This reduction of $4,067.87 in the net operating loss carryover deduction from 1956 to 1957 resulted from two adjustments made by respondent (in his amended answer) in petitioner's income for 1956. One adjustment, in the amount of $1,015.43, is conceded by the petitioner. The other adjustment is explained in paragraph 6(b)(1) of the amended answer as follows:

(1) The petitioner claimed a special deduction in its income tax return for the year 1956 for "distributions to members based upon participation" (page 3, line 40) in the amount of $3,052.44, which amount it did not pay. Respondent erroneously failed to disallow this deduction in the notice of deficiency, although the amount thereof is not an allowable deduction under the applicable provisions of the Internal Revenue Code of 1954. Accordingly, the petitioner's net operating loss for the year 1956 is properly reduced in the amount of $3,052.44.

OPINION.

The first issue is whether petitioner is an organization exempt from tax under section 501(c)(12), which provides exemption for "Benevolent life insurance associations of a purely local character, mutual ditch or irrigation companies, mutual or cooperative telephone companies, or like organizations; but only if 85 percent or more of the income consists of amounts collected from members for the sole purpose of meeting losses and expenses."

Petitioner is engaged solely in the business of financing purchases of electric appliances and the installation of electrical systems and water and plumbing systems by the customers of the rural electric cooperatives who are members of petitioner. All of petitioner's members are exempt from taxation under section 501(c)(12) as associations engaged in the distribution of electrical energy to residents of the agricultural areas of Kentucky.

Petitioner states on brief that an exemption of both the State statute,[1] under which petitioner and its member rural electrical co-

---

[1] Chapter 279 of the Kentucky Revised Statutes provides at section 279.020 that a "nonprofit cooperative corporation" may be formed under that chapter for either of the following purposes:

(1) To promote and encourage the fullest possible use of electric energy in this State by making electric energy available by production, transmission, distribution or otherwise to persons in rural areas of the State at the lowest cost consistent with sound business methods and prudent management, and by making available to such person, at the lowest cost consistent with sound business methods and prudent management, electrical devices, equipment, wiring, appliances, fixtures and supplies, and all kinds of tools, equipment and machinery operated by electric energy.

(2) To promote and encourage the fullest possible use of electric energy in this State by making electric energy available to persons in rural areas of the State at the lowest cost consistent with sound business methods and prudent management by producing, transmitting, distributing or furnishing electric energy to any corporation formed under this chapter for the purposes provided by subsection (1) of this section and only to such corporation, and by making available to such corporations and only to such cor-

operatives were organized, and the Federal statute establishing the Rural Electrification Administration [2] reveals a purpose "not merely to have cooperatives string wires and make electricity available but actively to encourage the use of the electricity by sponsoring and promoting the wiring of houses, the sale of electrical appliances, *and the financing of these activities.*" Petitioner also states that "The obvious purpose of the entire REA program was to upgrade the entire economy of the rural areas" and that the petitioner's objective "to finance the sale of electrical appliances, equipment, wiring and plumbing systems was directly and completely germane to the objectives of the REA Enabling Acts both State and Federal." Petitioner then contends that since all of its member rural electric cooperatives are exempt from taxation under section 501(c)(12), it follows that the petitioner "in performing one of the specific functions laid by law as a responsibility upon all Kentucky Rural Electric Cooperatives must also be exempt" under section 501(c)(12).

It is not controlling that petitioner was organized under Kentucky law as a nonprofit cooperative association. *Medical Diagnostic Association*, 42 B.T.A. 610. In order to qualify for the exemption under section 501(c)(12) the petitioner must meet the precise test laid down by the statute. It is the petitioner itself which must meet this test, and the fact that all of its members are tax-exempt organizations cannot determine the petitioner's status. *Underwriters' Laboratories, Inc.*, 46 B.T.A. 464, affd. 135 F. 2d 371.

It may be true that the financing of electrical appliances and installations in rural areas is one of the objectives under chapter 279 of the Kentucky Revised Statutes and the applicable Federal statute. It may also be true that some of petitioner's member rural electric cooperatives were doing their own financing prior to petitioner's organization in 1954 and that this did not prevent their qualifica-

---

porations, electrical devices, equipment, wiring, appliances, fixtures and supplies, and all kinds of tools, equipment and machinery operated by electric energy, and accounting services, forms and supplies, bargaining services, business counsel and advice, engineering services, supervisory services, investment counsel, general purchasing services of all kinds, and any other services that are requested or deemed advisable or desirable in the conduct of its business by any corporation formed under this chapter for the purposes stated in subsection (1) of this section. Any corporation organized under this chapter may be organized to do any or all of the acts set forth in this subsection.

[2] 7 U.S.C., ch. 31, sec. 905, provides as follows:

Sec. 905, Loans for electrical and plumbing equipment; persons eligible for loans

The Administrator is authorized and empowered, from the sums hereinbefore authorized, to make loans for the purpose of financing the wiring of the premises of persons in rural areas and the acquisition and installation of electrical and plumbing appliances and equipment. Such loans may be made to any of the borrowers of funds loaned under the provisions of section 904 of this title, or to any person, firm, or corporation supplying or installing the said wiring, appliances, or equipment. Such loans shall be for such terms, subject to such conditions, and so secured as reasonably to assure repayment thereof, and shall be at a rate of interest of 2 per centum per annum; interest rates on the unmatured and unpaid balance of any loans made pursuant to this section prior to September 21, 1944, of this amendment shall be adjusted to 2 per centum per annum. * * *

tion under section 501(c)(12). But the cooperatives which were granted exemption from tax under section 501(c)(12) were primarily engaged in the distribution of electric energy to rural areas, and it is this activity which brought them within the meaning of "Benevolent life insurance associations of a purely local character, mutual ditch or irrigation companies, mutual or cooperative telephone companies, or *like organizations.*" (Emphasis added.) Petitioner's sole activity in financing consumer purchases may presumably satisfy one of the objectives of the State and Federal statutes governing rural electrification, but this certainly does not mean that it satisfies the test laid down by section 501(c)(12), which is the statute controlling here. We fail to see how petitioner's purpose and operation, which are simply to finance consumer purchases, can qualify it as a "like organization" under section 501(c)(12). Petitioner's operation closely resembles that of a commercial bank or finance company, and, in fact, petitioner's manager testified that when petitioner was still in the planning stage there were "discussions with the bank people from the standpoint of their helping set it up. They were advising with us, and giving us the benefit of their experience and how we might operate it."

Moreover, an organization qualifies for exemption from tax under section 501(c)(12) "only if 85 percent or more of the income consists of amounts collected from members for the sole purpose of meeting losses and expenses." It is clear that petitioner's income arises in the form of interest, not from its member rural electric cooperatives, but from the *customers* of such local cooperatives, and these local cooperatives merely served as conduits to the petitioner of the periodic payments made by the rural customers to such cooperatives.

We hold that petitioner does not qualify as an organization exempt from taxation within the meaning of section 501(c)(12).

The next issue is whether petitioner is entitled to deduct as interest under section 163 the amounts paid by petitioner to holders of its so-called "debentures." This issue turns upon whether the amounts advanced by the member rural electric cooperatives to the petitioner constitute equity capital or a true indebtedness. The question is one of fact and the petitioner has the burden to establish the debtor-creditor relationship.

In *Wilbur Security Co.* v. *Commissioner*, 279 F. 2d 657, affirming 31 T.C. 938, the Ninth Circuit enumerated 11 factors which the courts have generally used to resolve this issue. They are (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and inter-

est; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; and (11) the ability of the corporation to obtain loans from outside lending institutions. No single one of these factors is determinative.

It is true that the instruments issued by petitioner were called "debentures" and that they show on their face an unconditional promise to pay a sum certain at a fixed maturity date, with quarterly interest payments. But even if all the formal criteria of indebtedness are satisfied, the remaining criteria listed above may, under the surrounding circumstances, compel a finding against the taxpayer. *Gooding Amusement Co.*, 23 T.C. 408, affd. 236 F. 2d 159.

Petitioner's financing business required the use of capital and, in fact, capital was its sole income-producing asset. Except for a relatively small investment in automobiles, the great bulk of its funds was loaned at interest. All of this capital, with the exception of an infinitesimal amount paid in by the member rural electric cooperatives as membership fees (ranging from $60 in 1954 to $140 in 1957) came from the issuance of "debentures" and from bank loans, and our findings of fact show that the "debentures" were easily the more important of the two sources of capital. It becomes readily apparent that the "debenture" proceeds were the only funds made available to petitioner by its members to enable it to carry on its business, and it would be an understatement to say that without these funds petitioner would be inadequately capitalized. The following testimony by petitioner's manager is significant:

Q. Isn't it a fact if the cooperatives withdrew their money the petitioner would be out of business?

A. That is true unless the bank would keep their financing. That would be something we would have to discuss with them.

In *Isidor Dobkin*, 15 T.C. 31, affd. 192 F. 2d 392, this Court stated that "When the organizers of a new enterprise arbitrarily designate as loans the major portion of the funds they lay out in order to get the business established and under way, a strong inference arises that the entire amount paid in is a contribution to the corporation's capital and is placed at risk in the business."

It is also apparent that even though the "debenture" holders had the right to enforce payment of the principal upon maturity, such enforcement would seriously cripple the petitioner's financing operations. See *Isidor Dobkin, supra*. It would be more likely that such funds would be left with the business and, indeed, this is suggested by the testimony of the petitioner's manager which we have quoted above.

Also, the face of the "debentures" indicates that the "obligation of this debenture is subordinate to all credit extended issuer by banks." Since it appears from the stipulation that such bank credit was the only existing debt other than the "debentures," the subordinate position of these "debentures" to petitioner's regular corporate creditors is obvious.

The "debentures" were offered for sale only to the rural electric cooperatives, and although some rural cooperatives participated in petitioner's financing program without purchasing its "debentures" the record suggests that there was a close identity between the "debenture" holders and the member rural electric cooperatives.

We believe on the basis of this record that petitioner has failed to establish that the "debentures" represented a creditor interest rather than an equity interest. We sustain respondent on this issue.

The next issue is whether petitioner is entitled to a special deduction in 1956 of $3,052.44, which it allocated to its member cooperatives on its books and deducted on its 1956 income tax return as a "Distribution to Members based on Participation." Petitioner allocated this amount to the members on the basis of the dollar volume of loans made through the member cooperatives. The amount, which was never actually paid to the members, was shown on petitioner's books in a capital credits account, which is similar to a surplus account. This deduction in 1956 affects the net operating loss carryover deduction claimed by petitioner for 1957. Respondent has the burden of proof on this issue since it was raised by an amendment to his answer, but the controlling facts are all undisputed.

Although petitioner refers us to the regulations under section 522, it is clear that this section deals exclusively with farmers' cooperatives that are exempt from taxation under section 521. Petitioner is not a farmer's cooperative organization. However, petitioner's failure to qualify as an exempt organization under section 521 or under section 501(c)(12) does not end the matter. Although nothing in the Internal Revenue Code of 1954 explicitly provides for the exclusion or deduction of patronage dividends, refunds, or rebates by a nonexempt cooperative, it has long been the administrative practice of the respondent to permit the exclusion of true patronage dividends by nonexempt cooperatives under certain conditions. I.T. 1499, I–2 C.B. 189, 191 (1922); A.R.R. 6967, III–1 C.B. 287 (1924); S.M. 2595, III–2 C.B. 238 (1924); G.C.M. 12393, XIX–2 C.B. 398 (1933); G.C.M. 17895, 1937–1 C.B. 56; I.T. 3208, 1938–2 C.B. 127; Rev. Rul. 57–59, 1957–1 C.B. 24. Respondent's practice of permitting the exclusion of such patronage dividends is recognized indirectly by section 522(b)(2), which provides that patronage dividends, refunds, and rebates to patrons shall be taken into account in computing taxable income (of an exempt cooperative) "in the same manner as in

the case of a cooperative organization not exempt under section 521."

The theory behind respondent's practice, which has been recognized by this and other courts, in allowing the exclusion of patronage dividends by nonexempt cooperatives is that the dividends in effect are either rebates to patrons of a part of the price initially paid by them on purchases made through a cooperative purchasing organization, or additions to the prices initially paid by the cooperative to its patrons for products which the patrons had marketed through the cooperative. *Farmers Cooperative Co.,* 33 T.C. 266, reversed on another ground 288 F. 2d 315; *Clover Farm Stores Corporation,* 17 T.C. 1265; *Midland Cooperative Wholesale,* 44 B.T.A. 824; *Fruit Growers Supply Co.,* 21 B.T.A. 315, affd. 56 F. 2d 90.

*In Clover Farm Stores Corporation, supra,* we said:

> True patronage dividends include only those amounts which the taxpayer is required to return to its members as rebates or refunds *on business transacted with such members.* Any profits made on business transacted with nonmembers which may be distributed to members are fully taxable. See A.R.R. 6967, III–1 C.B. 287, 289; *Valparaiso Grain & Lumber Co.,* 44 B.T.A. 125, 126, 127. * * * [Emphasis added.]

In *Southwest Hardware Co.,* 24 T.C. 75, 81, this Court stated that "where a cooperative is obligated to refund to members the profit realized *from business transacted with members,* it is proper to exclude such profits from taxable income on the theory that they belong to the members and are not income of the cooperative." (Emphasis added.) In *Pomeroy Cooperative Grain Co.,* 31 T.C. 674, affirmed on this issue 288 F. 2d 326, this Court enumerated at least three prerequisites which must be met in order for an allocation of earnings by a cooperative association to qualify as a "true corrective and deferred price adjustment, and hence as a true patronage dividend." One of these prerequisites was that "the allocation must have been made out of profits or income realized from transactions with the particular patrons for whose benefit the allocations were made, and not out of profits or income realized from transactions with other persons or organizations which were not entitled to participate in such allocations."

It is readily apparent that the "patronage dividend" allocated by petitioner on its books to its member cooperatives does not qualify as a true patronage dividend since it represented a "net profit" which was not realized from transactions with its patrons (in this case, the member cooperatives), but instead from the customers of its patrons. A customer of a member cooperative, upon making a purchase from an appliance dealer, would make a downpayment and sign a promissory note and conditional sales contract for the balance. The dealer assigned the papers to the member cooperative, which in turn reassigned them to petitioner. Repayments of the notes were made by

the customer at interest to the member cooperative, which in turn remitted the amount to petitioner. Obviously, the member cooperatives were nothing more than conduits, and it cannot be maintained that the transactions, which gave rise to petitioner's profits, were with them. Put differently, it cannot be said that petitioner's "patronage dividends" to its members were "true corrective and deferred price adjustment[s]" on transactions with its members.

We hold for the respondent on this issue.

Reviewed by the Court.

*Decision will be entered under Rule 50.*