National Automobile Dealers Association v. Commissioner.
National Auto. Dealers Assn. v. Commissioner
Docket No. 108670.
United States Tax Court
1943 Tax Ct. Memo LEXIS 250; 2 T.C.M. (CCH) 291; T.C.M. (RIA) 43291; June 17, 1943
*250 Charles W. Bishop, Esq., for the petitioner. Philip A. Bayer, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined deficiencies in income tax and excess profits tax for the years 1934, 1935, and 1938, with penalties thereon as follows: Income Tax
Years
Liability
Assessed
Deficiency
25% Penalty
5% Penalty
1934
$14,133.78
None
$14,133.78
$3,533.45
$ 706.69
1935
6,148.98
None
6,148.98
1,537.25
307.45
1938
754.49
None
754.49
188.62
37.72
Total
$21,037.25
None
$21,037.25
$5,259.32
$1,051.86
Excess-Profits Tax
1934
$ 5,139.56
None
$ 5,139.56
$1,284.89
$ 256.98
1935
2,235.99
None
2,235.99
559.00
111.80
1938
807.95
None
807.95
201.99
40.40
Total
$ 8,183.50
None
$ 8,183.50
$2,045.88
$ 409.18
The parties have stipulated that petitioner is not liable for any penalties for the years 1934, 1935, and 1938. The facts are stipulated in part. All of the issues have been disposed of by written stipulation except the issue as to whether petitioner is entitled to exemption from tax as a business league within the provisions of section 101 (7) of the Revenue Acts of *251 1934 and 1938. Findings of Fact Petitioner is a Delaware corporation with its principal office at 1026 17th Street, N.W., Washington, D.C. During the years involved in this proceeding, it was an Illinois corporation. It filed its income tax returns with the collector for the district of Michigan. Petitioner keeps its books and makes its returns on the accrual basis. It was organized in 1917 under Illinois law as a non-profit corporation, and was formed, as stated in the Certificate of Organization, "to promote and safeguard the interests of wholesale and retail dealers in motor vehicles throughout the United States." In April 1934, the Articles of Incorporation were amended to increase the number of directors and to enlarge the purposes of the Association to (1) develop for the automobile business a basis for forward planning; (2) promote the welfare of its members; (3) oppose discriminatory legislation relating to the motor vehicle retailing trade, and promote model laws; (4) distribute to its members the fullest information obtainable regarding their business; (5) improve the efficiency of selling (6) develop the spirit of inter and intra-industry cooperation; (7) seek the betterment *252 of trade relations; (8) aid in establishing proper business standards; (9) improve the economic position of those engaged in the business of automobile retailing; (10) encourage and assist in the formation of local and state associations and seek to merge these and all other dealer units throughout the country into one strong national organization; and, (11) to issue such Trade publications as the Board of Directors may authorize and to sell same to members or non-members at such prices as may be authorized by the Board of Directors. Prior to the adoption of a Code of Fair Competition under the National Industrial Recovery Act, there was price cutting in the automobile industry by reason of overallowance on used cars. On October 3, 1933, President Roosevelt signed the Code of Fair Competition for the Motor Vehicle Retailing Trade under the provisions of the National Industrial Recovery Act. The Code required each dealer to furnish sworn statements of all actual retail sales of used automobiles to petitioner which, in turn, was directed to compute and publish the average price approximately every sixty days in the Official Used Car Guide. The dealer was to base his allowance on a *253 used car turned in, in trade, on these average prices. Petitioner commenced publishing the Used Car Guide, hereinafter referred to as the Guide, in December 1933. After the National Industrial Recovery Act was reclared unconstitutional so that the Code was no longer valid, and on May 31, 1935, a meeting of the directors of petitioner was held, and as a result of said meeting it was announced that the publication of the Guide would be continued. Purchasers of the Guide used it to determine the value of a used car. During the year 1934, and to September 1935, the price of the Guide was $12 per yearly subscription, which included one copy a month. Membership dues of petitioner were $4 annually. In September 1935, the subscription price to the Guide was $8, and membership dues were $12. During 1938, membership dues were $12, and subscriptions to the Guide were $8 for single subscriptions with a scale of prices for volume subscriptions. In the sale of the Guide, non-members of the association were charged the same price as members. Petitioner also published a bulletin which it sold to members and nonmembers. During the years involved in this proceeding, petitioner, in addition to publishing *254 the Guide and the Bulletin, conducted surveys of automobile dealers to determine the average cost of conducting the different departments of the dealer's business; it aided state associations of automobile dealers to promote model laws and to oppose discriminatory ones; it released to the press publicity stories setting forth the utility value of the automobile; it sent out a questionnaire on factory-dealer relations and compiled a chart showing the differences in the contracts between manufacturers and dealers; it also worked on a plan for a model contract between the manufacturer and the dealer, for fair trade practice rules, the promotion of a national used car week, the promotion of a uniform junking plan, and other activities looking toward the welfare of automobile dealers. The total cost of these activities was paid principally from the revenue derived from the sale of the Guide. During the years 1934 to 1938, inclusive, the activities of petitioner were divided into two divisions, known as the "Official Guide Division" and the "Membership Division." The gross income and net income or loss of the separate divisions and the combined gross income and net income or loss of both *255 divisions for the years 1934 to 1938, inclusive are as follows (Net Loss shown in parenthesis): Official Guide Division
Membership Division
Combined
Gross
Net
Gross
Net Income
Gross
Net Income
Year
Income
Income
Income
or (Loss)
Income
or (Loss)
1934
$458,995.79
$83,323.27
$100,812.34
$19,467.84
$559,808.13
$102,791.11
1935
365,636.38
96,779.87
70,148.03
(52,060.04)
435.784.41
44,719.83
1936
191,714.69
12,870.82
69,882.55
(40,884.79)
261,597.24
(28,013.97)
1937
137,394.47
4,855.69
49,822.92
(25,992.91)
187,217.39
(21,137.22)
1938
159,916.84
34,314.95
55,732.46
(27,582.06)
215,649.30
6,732.89
The surplus and/or deficit of each of the two separate divisions and the combined surplus and/or deficit as of December 31 of each year is as follows (Deficits shown in parenthesis): Official
Guide
Membership
Year
Division
Division
Combined
1933
[26,344.15)
$ (1,673.28)
[28,017.43)
1934
56,979.12
11,151.83
68,130.95
1935
153,758.99
(40,908.21)
112,850.78
1936
166,629.81
(82,238.95)
84,390.86
1937
171,485.50
(108,231.86)
63,253.64
1938
205,800.45
(135,813.92)
69,986.53
Throughout the *256 years here involved and for a number of years prior thereto books containing stated values of used automobiles and similar in style to the "Official Guide" were published by at least two regular business corporations that were organized and operated for profit. One of these publications known as the "Blue Book" has been continuously published since 1911. During the year 1934, 11.83 per cent of the sales of the "Official Guide" were made to non-members; in 1935, 28.06 per cent of the sales of the "Official Guide" were made to non-members; and in 1938, 74.28 per cent of the sales of the "Official Guide" were made to non-members. Since its organization, no assessments have ever been made by petitioner upon its members. In 1934, petitioner had a membership of 18,082, in 1935 its membership was 7,818, and in 1938 its membership was 4,067. In 1934, it employed approximately 100 employees and had its offices in St. Louis, Missouri. Its president, as general manager, was paid a salary of $25,000 a year, and its secretary was paid a salary of $9,000 a year. There was no provision in the original certificate of organization, the amended certificate or the by-laws for the payment of dividends *257 or the distribution of property to members. At a meeting of petitioner's directors held August 17, 1933, to consider the Code and the publishing of the Guide, the question was raised by one of petitioner's directors as to whether the publication of the Guide would be profitable to petitioner. The chairman of the Board considered that it would be profitable. Petitioner employed three methods of solicitation for the sale of the Guide: (1) It employed approximately 30 salesmen for the Guide who were paid a straight salary and expenses. These salesmen called on people who were not in the automobile industry, as well as those who were in the industry, and attempted to sell them the Guide. Non-members, as well as members, were solicited to subscribe. In 1934, salaries and wages paid by petitioner were $161,927.34, and traveling expense was $45,245.24; in 1935, salaries and wages were $178,946.31, and traveling expense was $55,316.96; in 1938, salaries and commissions were $68,274.42, and traveling expense was $11,031.07. (2) It made direct mail solicitation with people outside the automobile industry as well as those within the industry. Mail solicitation was carried on with non-members *258 as well as members. In 1934, it spent $14,155.91 for postage; in 1936, $14,101.33; and in 1938, $10,561.27. (3) Petitioner cooperated with state and local associations, whose members were automobile dealers, to sell the Guide to those dealers. Petitioner offered to sell the Guide to finance companies, automobile underwriters, banks, insurance adjusters, automobile factories, independent used dealers, and local tax assessors. Some time after the expiration of the N.R.A. Code, petitioner advertised the Guide in its Bulletin, and in 1938 a reciprocal arrangement was in effect with the American Finance Conference whereby advertisements for the American Finance Conference were published in petitioner's Bulletin, and advertisements for the Guide were published in the American Finance Conference News. Petitioner, during the years involved in this proceeding, was not a business league within the meaning of section 101 (7) of the Revenue Acts of 1934 and 1938. Opinion The only question is whether petitioner is entitled to be exempt from tax as a business league under subsection 7 of section 101 of the Revenue Acts of 1934 and 1938. [1] The provision is the same in all of the Acts. *259 Respondent contends that in publishing and selling the "Official Used Car Guide" to the public, petitioner is engaged in a regular business ordinarily carried on for profit, and as the income from this business represents a substantial part of petitioner's income, it is not an exempt organization. Respondent relies in part on Article 101 (7)-1 of Regulations 86, under the Revenue Act of 1934, [2] and Regulations 101 under the Revenue Act of 1938, which are identical. *260 Petitioner contends that even though it is earning a large net annual profit, it is a business league exempt from tax, on the ground that it was not organized for profit and none of its profits inures to its members. It should be noted at the outset that a statute creating an exemption must be strictly construed, and any doubt must be resolved in favor of the taxing power. Commissioner v. Northwest Steel Rolling Mills, Inc., 311 U.S. 46; SunHerald Corporation v. Duggan, 73 Fed. (2d) 298. To come within the purview of subsection 7 of section 101 of the Revenue Act of 1934, an organization must be (1) a business league, chamber of commerce, or board of trade; (2) not organized for profit; and (3) no part of its net earnings inures to the benefit of any private shareholder or individual. The statute exempting business leagues from taxation has been reenacted in the same terms in successive revenue acts since 1913. Identical provisions of the applicable regulations were promulgated under all of the revenue acts since 1928. The administrative interpretations placed upon the term "business league" has remained the same *261 over many years and Congress, by reenacting the provision without change, has ratified that interpretation. Uniform Printing & Supply Co. v. Commissioner, 33 Fed. (2d) 445; Durham Merchant's Ass'n v. United States, 34 Fed. Supp. 71. To constitute a business league, under the regulation, the activities of the organization must be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. The organization cannot engage in a regular business of a kind ordinarily carried on for profit. Petitioner was not a business league exempt from tax since it engaged in a business ordinarily carried on for profit, and its profits from that business inured to its members. The facts of this case bring it within the principles enunciated in Retailers Credit Ass'n of Alameda County v. Com., 90 Fed. (2d) 47; Fort Worth Grain & Cotton Exchange, 27 B.T.A. 983; Durham Merchant's Ass'n v. U.S., 34 Fed. Supp. 71; and Industrial Addition Ass'n, 1 T.C. 378. *262 During the years in question, the publication and sale of the Guide by petitioner was carried on in a typical business manner. The president of the corporation received an annual salary of $25,000 and the secretary an annual salary of $9,000. In 1934, petitioner had approximately 100 employees and maintained large offices in St. Louis, Missouri. It had 30 salesmen whose sole duties were to travel throughout the county and solicit orders for the Guide from members and non-members. In 1938, almost 75 percent of the sales of the Guide were made to non-members. Among others, petitioner offered to sell its Guide to financial companies, automobile underwriters, banks, insurance adjusters, automobile factories, independent used car dealers, and local tax assessors. In the three years involved in this proceeding, petitioner paid to its employees over $500,000 in salaries, commissions, and traveling expenses. Mail solicitation for the sale of the Guide was carried on extensively with non-members of the Association. Postage spent by petitioner during 1934, 1935, and 1938, amounted to almost $40,000. The Guide was advertised for sale in petitioner's Bulletin and in the American Finance Conference *263 News, an independent publication which carried the advertisements of a competing manual of used car values known as the Blue Book. Petitioner admits that during the years 1934, 1935, and 1938, books containing stated values of used automobiles similar in style to the Guide were published by at least two regular business corporations that were organized and operated for profit. Under the circumstances, it cannot be said that petitioner's business was not the performance of particular services for individual persons. Retailers Credit Ass'n of Alameda County v. Commissioner, supra. It was engaged in a regular business of a kind ordinarily carried on for profit. Fort Worth Grain & Cotton Exchange, supra.In the last-mentioned case, the Court said: * * * Obviously it is not a business league in the usual sense, since its services were available to nonmembers as well as members. In our opinion it has failed to overcome the presumption of correctness which attaches to the determination of the respondent. Petitioner also argues that it is a "business league" since it was organized under the laws of Illinois as a non-profit corporation and that its charter *264 and by-laws prohibited the distribution of dividends. This, however, is not controlling. Medical Diagnostic Ass'n, 42 B.T.A. 610; Underwriters Laboratories, Inc., 46 B.T.A. 464, affirmed, 135 Fed. (2d) 371. As was said by the Court in West Side Tennis Club v. Commissioner, 111 Fed. (2d) 6; certiorari denied, 311 U.S. 674: * * * While the taxpayer was undoubtedly "organized * * * exclusively for pleasure, recreation, and other nonprofitable purposes," it cannot be said that it was so operated. The major tennis tournaments were not exclusively for the pleasure or recreation of the members. It was not and cannot be shown that no part of the net earnings inured "to the benefit of any private shareholder." In reality the situation is much the same as though the members had gone into the business of selling tickets for athletic events in order to make money and had then used the profits to finance a club in which they were interested. In the present case a substantial and profitable business was conducted, though for a limited time each *265 year, which had only an indirect relation to the recreational objects of the club. An important, if not a primary, reason for holding the major tournament operations was the benefit of the members, for they would have had to pay larger dues or restrict club operations uncomfortably unless profits had been realized by the club from outsiders who were willing to purchase tickets for the great annual tennis matches. The reasoning of that decision is especially appropirate here. The activities in behalf of petitioner's members were carried on at a great loss, and if it were not for the profits derived from the sale of the Guide, petitioner would have had to restrict its operations or else levy a large assessment on its members. Petitioner's membership division for the years 1934 to 1938, inclusive, was operated at a loss of $127,051.96, whereas during the same period, petitioner realized profits from the sale of the Guide in the amount of $232,144.60. It is obvious that petitioner's members are benefited to that extent. Petitioner places much reliance upon the fact that the Guide was published originally pursuant to the Code of Fair Competition for the Motor Vehicle Retailing Trade under *266 the provisions of the National Industrial Recovery Act, and that its officers had no intention to make profits from the sale of the Guide. It is well settled, however, that this is not determinative. In Apartment Operators Ass'n, 46 B.T.A. 229, it was held that the fact that "the officers had no intention to conduct its operations at a profit is less important than its actual operations." Petitioner could have established prices for the Guide which would not have resulted in such substantial profits. Not having done so, it is reasonable to assume that it intended to operate for profit. West Side Tennis Club, supra. Petitioner relies principally upon Trinidad v. Sagrada Orden De Predicadores, 263 U.S. 578, Crooks v. Kansas City Hay Dealers Ass'n, 37 Fed. (2d) 83; and King County Inc. Ass'n, 37 B.T.A. 288. All of these cases however are distinguishable. In Trinidad v. Sagrada Orden DePredicadores, supra, it was stipulated that the corporation was both organized and operated for religious, charitable, *267 and educational purposes. There the essential requirements were stipulated in the taxpayer's favor. In addition, the income derived from the incidental sale of wine, chocolate, and other articles was very small, and the sales of these articles was made solely within the taxpayer's own organization and agencies. In Crooks v. Kansas City Hay Dealers Ass'n, supra, the inspection fees and dues were usually no more than required for expenses necessary to the purposes of association and in some years were insufficient to meet operating costs. The Court also found that there were no other associations in Kansas City furnishing similar service so that the Association did not compete with any business. The Kansas City Hay Dealers Ass'n confined its activities to the purposes for which it was organized and conducted no operations primarily for profit. In American Society of Cinematographers, Inc., supra, the society published a magazine for the dissemination of scientific information to its members. It was never expected that the magazine would be operated at a profit to the membership and the evidence showed that over a period of 14 years it operated *268 at a loss of $2,333.92. The Court further found that the publication of the magazine was necessary for the advancement of the art of cinematography and that it was not published for profit. In King County Ins. Ass'n, supra, the Court found that the taxpayer was not operated for profit, that it never had any physical assets of a value in excess of $2,500, and that it had accumulated only a negligible amount of money. Under the circumstances, and upon all the evidence, it is held that petitioner has failed to establish its right to exemption as a business league under subsection 7 of section 101 of the Revenue Acts of 1934 and 1938 and, accordingly, the action of the respondent in holding it subject to tax is sustained. Decision will be entered under Rule 50. Footnotes
1. SEC. 101. EXEMPTIONS FROM TAX CORPORATIONS. The following organizations shall be exempt from taxation under this title - * * * * *
(7) Business leagues, chambers of commerce, real-estate boards, or boards of trade, not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual;↩
2. Art. 101 (7)-1. Business leagues, chambers of commerce, real estate boards, and boards of trade. - A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus its activities should be directed to the improvement of business conditions of one or more lines of business distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining, is not a business league. An association engaged in furnishing information to prospective investors, to enable them to make sound investments, is not a business league, since its activities do not further any common business interest, even though all of its income is devoted to the purpose within the meaning of the law and is not exempt from tax.↩