The Marian Foundation v. Commissioner.
Marian Foundation v. Commissioner
Docket No. 76233.
United States Tax Court
T.C. Memo 1960-18; 1960 Tax Ct. Memo LEXIS 272; 19 T.C.M. (CCH) 99; T.C.M. (RIA) 60018; February 15, 1960
Roger K. Powell, Esq., 17 South High Street, Columbus, Ohio, for the petitioner. William O. Allen, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: Involved in this proceeding are deficiencies in income tax and additions thereto, for the years and in the amounts as set forth below: Year Ended
Additions to Tax
April 30
Deficiency
Sec. 6651(a)
1955
$ 9,065.69
$1,813.14
1956
13,172.19
3,293.05
The issues are: (1) Whether, during the years in issue, petitioner was an exempt organization within the meaning of section 501(c)(3) of the 1954 Code; *275 if so (2) whether it realized unrelated business income during those years taxable under the provisions of section 511 of the 1954 Code; and (3) whether it is liable for additions to tax under section 6651(a) of the 1954 Code for failure to file timely income tax returns. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found, and are incorporated herein by this reference. The Marian Foundation (hereafter referred to as the petitioner) was organized under the laws of Ohio relating to not-for-profit corporations on May 15, 1954. It filed delinquent Federal income tax returns (Form 1120) for its taxable years 1955 and 1956 with the district director of internal revenue at Columbus, Ohio. On January 27, 1952, Raymond Bauschard, a secular priest of the Roman Catholic Church, and Harry Haney created the John Waldo Trust No. 1 to hold title to a tract of land purchased by them known as the Snider Farm. Bauschard owned a two-thirds interest in this property, and Haney, a one-third interest. Subsequently, all except the front part of this property was leased to the Rosary Development Company for development into residential lots. This front portion *276 of the property was reserved by its owners for future development. The Development Company, after subdividing and improving the leased property, then sold lots to various builders in the community, retaining a portion of the sales proceeds and remitting the balance to the Trust. The Development Company was an Ohio corporation engaged in the business of subdividing, improving, developing and selling urban real estate. Its stock was owned: 60 per cent by Edward Tonti; 20 per cent by Richard Albanese; and 20 per cent by Estel Gifford. Late in 1953, Bauschard found himself in the possession of certain properties in which he had no personal interest, and which he felt could be committed to various religious and charitable uses. Among these properties was his interest in the reserved portion of the Snider Farm. Further he wished at this time to aid in the establishment of a convent and school for the Sisters of St. Joseph in the Columbus area, as well as the construction of a Catholic high school in the west end of that City. He estimated the cost of the convent and school at some $250,000, and the cost of the high school anywhere from $200,000 to $1,000,000. After seeking legal advice *277 as to the best manner in which to put his property to charitable uses, as well as to embark upon the desired accumulation of funds, Bauschard organized the petitioner. As revealed by its articles of incorporation, its stated purpose was: "To receive and administer funds for scientific, educational, religious and charitable purposes, all for the public welfare and for no other purposes, and to that end the corporation shall have the power and authority to borrow money and to receive, buy, pledge, mortgage, encumber, sell, lease and otherwise acquire by gift, devise or inheritances, real and personal property of any kind and character necessary to promote the objects of the corporation and to hold, use, pledge, mortgage, encumber, sell, invest and re-invest the same and collect and disburse the income and principal for such purposes. A recitation in any deed of conveyance made by the corporation that the sale has been authorized by a majority of the Board of Directors shall protect the purchaser of such property. And in general, to exercise any, all and every power for which a nonprofit corporation known as a foundation organized under the provisions of the Ohio Corporation Act for *278 scientific, educational, religious and charitable purposes all for the public welfare can be authorized to exercise by no other power. No part of the activities of this corporation should be the carrying on of propaganda, or otherwise attempting to influence legislation." Should the corporation be dissolved or terminated its assets were to be distributed solely for charitable purposes. Its By-Laws provided for corporate officers who were to serve without compensation. Petitioner has no stock or stockholders. Since July 14, 1954, its Board of Trustees has been comprised of the following individuals: Edwin Murphy, Raymond Bauschard, Maurice Donovan, Richard Dodd, James Kraus, Richard Albanese, Joseph Fodey, Harry Haney, Bernard Kerscher, Edward Tonti, Richard Werling (to 1956), Harold Roberts (from 1956) On June 1, 1954, petitioner received by gift from Trust No. 1 a vacant lot at the corner of Sullivant and Demorest Avenues in Columbus which was a part of the reserved portion of the Snider Farm. This property had an adjusted basis of $434.92 in the hands of the donor. The following entries, pertinent to the receipt of that property, appear in the minutes of the first meeting *279 of petitioner's trustees held on July 14, 1954: "On the motion of Mr. Fodey, duly seconded by Msgr. Murphy, it was unanimously [resolved] that the Secretary should write a letter of acceptance and thanks to Mr. John Waldo as trustee for the Reverend Raymond Bauschard and Mr. Harry Haney Sr. for the gift of property at the southwest corner of Sullivant and Demorest Avenue valued at thirty thousand dollars. "On the motion of Father Dodd, duly seconded by Msgr. Murphy, it was unanimously resolved that the Marian Foundations property at the southwest corner of Sullivant and Demorest Avenues be sold to the Ohio Oil Company for the sum of thirty-one thousand dollars cash." On August 25, 1954, the Ohio Oil Company, pursuant to prior negotiations, purchased this lot from the petitioner for $31,000. Also on June 1, 1954, petitioner received by gift: 6 shares of stock of Derrer Apartments valued at $600; and 2 shares of stock of Rosary Builders, Inc. valued at $200. On February 15, 1954, John Waldo, as trustee, had acquired a tract of land on the outskirts of Columbus known as the Mary Demorest Farm; part of which was acquired for the benefit of the petitioner. Subsequently, petitioner *280 paid Waldo $97,630 for 48.815 acres of that property; $26,800 in cash, and the balance in funds borrowed from Trust No. 1. This payment was made on August 25, 1954. On January 15, 1955, the John Waldo Trust No. 2 was created by petitioner, Harry Haney, and Edward Tonti. As trustee, Waldo held 48.815 acres of the Mary Demorest Farm in trust for the petitioner, and the remainder in trust for Haney and Tonti. On January 20, 1955, petitioner's portion of the Mary Demorest Farm was sold, on the installment basis, to the Rosary Development Company for $225,000. In consideration for that sale, the Development Company issued to Trust No. 2 two unsecured notes each in the amount of $112,500, bearing interest at 4 per cent per annum, one of which was due in July 1956, and the other in July of 1957. From January 20, 1955 through December 31, 1957, the Development Company made the following payments on the principal amount of these notes: July 7, 1955
$20,000
July 11, 1955
5,000
September 13, 1956
10,000
November 2, 1956
3,000
March 18, 1957
18,000
April 1, 1957
7,000 As of the hearing herein, no interest has been paid on these obligations. The failure *281 of the Development Company to make timely payment on the notes was occasioned by financial difficulties incurred in developing the Mary Demorest Tract. Builders, to whom lots in the Tract had been sold, had encumbered them with mortgages prior to payment of the purchase price to the Development Company. Thereafter, before the houses were completed, the builders defaulted on their mortgage payments and foreclosure was threatened. Faced by a complete loss of the property should the mortgagees foreclose, those involved in the development of the property formed the Eakin Realty Company. It was planned that Eakin would assume the builders' liabilities under the mortgages, and then complete construction and sale of the houses on the lots involved. Eakin's stock was owned: 60 per cent by Edward Tonti; 20 per cent by Robert Fineran, Jr.; and 20 per cent by E. O. Gifford. In order to protect its interest in the Mary Demorest Tract, petitioner, on June 7, 1956, loaned the sum of $5,000 interest-free to Eakin to provide funds with which it might purchase the materials necessary to the construction and ultimate sale of the houses. At the time of this trial, Eakin had made no payments on this loan. *282 Bauschard was appointed by the Bishop of Columbus to acquire a tract of land for the construction of a new church. Accordingly, he took an option on 49 acres located on Reed Road. However, the Bishop failed to approve the site, and purchased other property on the same street. Believing construction of a new church in the area would enhance the value of surrounding properties, and thus considering the tract under option to be a good investment, Bauschard exercised the option on the Reed Road property in favor of petitioner, Harry Haney, and Edward Tonti, share and share alike. The property was purchased for $56,000 on February 25, 1954. In March of 1954, the property was transferred by its owners to the John Waldo Trust No. 3 to hold for their benefit. In July 1954, a second tract of land consisting of 79 acres and located on Hague Avenue, was added to the corpus of Trust No. 3. This property had a total cost of $63,525. Petitioner's share of the purchase price of these properties was $28,166.66. In June of 1957, petitioner donated its interest in the Reed Road property to St. Mary Magdalene Church, an exempt organization, contributions to which were deductible from gross income as *283 provided in section 170 of the 1954 Code. On May 2, 1955, petitioner purchased 2 vacant lots for a total purchase price of $18,577.50. One of these was sold in August of that year for $20,000; the second was sold in December for $21,500. In August of 1955 petitioner purchased at cost from Trust No. 1 a 120-acre tract known as the Clime Road Farm. The total purchase price was $35,000, paid by petitioner through the assumption of a $20,000 mortgage and a cash payment, made in March 1957, of $15,000. The property was acquired with the intention that the greatest portion thereof be utilized for the convent and school planned for the Sisters of St. Joseph, an intention which continued to exist at the time of trial. That portion of the property not needed for construction of the convent and school was sold by petitioner in various individual transactions. The first such sale involved 1.029 acres sold for $2,000 in November of 1955. The purchaser paid $1,000 in January 1956, and the balance in December of 1957. The second sale took place in February of 1956, petitioner disposing of.815 acres for $2,000. As of the date of sale $1,000 was paid. However, no further payments were made on *284 account of this transaction by the close of 1957. The final sale was made in February 1957, petitioner selling 21.219 acres to the Rosary Development Company for $18,000. The purchase price was paid through the assumption of a $16,000 mortgage on the property, with the unpaid balance of $2,000 being treated by petitioner as an account receivable. As of the date of trial herein, this account remained unpaid. At no time did petitioner charge or receive interest on the unpaid balances due on these sales. In furtherance of its fund-raising objectives, petitioner opened a brokerage account. In March of 1956, it purchased 500 shares of common stock of the American Cable and Radio Company for $3,181.25. During the taxable years ended April 30, 1955 and 1956, the years in issue, petitioner made the following donations to exempt organizations, contributions to which were deductible to the extent provided by section 170 of the 1954 Internal Revenue Code: Date
Donee
Amount
1-12-55
St. Mary Magdalene Church
$ 500.00
1-12-55
Our Lady of Sorrows Church
100.00
1-12-55
Our Lady of Perpetual Help
Church
100.00
1-12-55
Camp St. Joseph
100.00
4-14-55
Aquinas High School
500.00
4-14-55
Sisters of St. Joseph
100.00
9-28-55
Mt. Carmel Hospital
100.00
9-28-55
St. Mary Magdalene Church
500.00
12-14-55
Sisters of Sick Poor
100.00
12-14-55
Camp St. Joseph
400.00
12-14-55
St. Mary Church
1,000.00
12-14-55
St. Mary Magdalene Church
3,000.00
Total
$6,500.00
*285 Neither petitioner nor its officers at any time solicited offers for its real property, offered it for sale, or employed agents to sell such real estate. However, when attractive offers were made petitioner indicated a readiness to sell. As of the date of trial, petitioner owned a one-third interest in the 79-acre Hague Road tract held by Trust No. 3, and Clime Road Farm, consisting of 97 acres. Acknowledging that petitioner's returns for the periods ended April 30, 1955 and 1956 were filed under a protest that it was exempt from tax, respondent determined that it was not so exempt under the provisions of section 501 of the 1954 Internal Revenue Code. On the grounds that petitioner's returns for those periods were not timely filed, he further determined additions to tax under section 6651. However, as to the taxable period ended April 30, 1955, he acknowledged petitioner's failure to file for the period extending from due date of that return, July 15, 1955, to April 30, 1956, was due to reasonable cause, and accordingly determined an addition to tax only for the period beginning on July 15, 1956 and terminating on November 13, 1956, the date upon which that return was actually *286 filed. Petitioner was organized and operated during the years in issue exclusively for one or more of the exempt statutory purposes enumerated in section 501(c)(3) of the 1954 Internal Revenue Code. Opinion In support of his determination that petitioner was not an exempt organization during the years in issue, respondent contends it was neither organized nor operated during that period exclusively for any of the exempt statutory purposes. Rather, he submits it was organized and operated primarily to engage in the trade or business of buying and selling real estate, the proceeds from which were either to be held for the benefit of, or turned over to, various exempt organizations. Thus he concludes petitioner was a "feeder corporation" within the meaning of section 502 of the Code. [1]
*287 Insofar as material to the instant proceeding, the exemption from tax provided by section 501(a) of the 1954 Code is extended by section 501(c)(3) to: "Corporations, and any community chest, fund or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office." Therefore, in order to prevail, petitioner must establish that it was organized and operated exclusively for one of the statutory purposes during the years in issue, and further show that no part of its net earnings inured to the benefit of any private individual. The purposes which underlie the organization and operation of an organization such as petitioner are questions of fact *288 to be decided after a consideration of the entire record. Lorain Avenue Clinic, 31 T.C. 141 (1958); Cummins-Collins Foundation, 15 T.C. 613 (1950); Underwriters' Laboratories, Inc., 46 B.T.A. 464 (1942), affd. 135 F. 2d 371 (C.A. 7, 1943), certiorari denied 320 U.S. 756 (1943). As used in the statute, the term "exclusively" means primarily or principally, and has reference to the nature of those activities which comprise the substantial portion of the functions of the corporation seeking exemption. Activities not serving directly to further an exempt corporate purpose must be minor in comparison to the exempt activities, and incidental thereto. Squire v. Students Book Corp., 191 F.2d 1018 (C.A. 9, 1951); Estate of Philip R. Thayer, 24 T.C. 384 (1955); Alan Levin Foundation, 24 T.C. 15 (1955); John Danz, 18 T.C. 454 (1952), affd. 231 F. 2d 673 (C.A. 9, 1955), certiorari denied 352 U.S. 828 (1956), rehearing denied 353 U.S. 951 (1957). By charter, petitioner was organized to "receive and administer funds for scientific, educational, *289 religious and charitable purposes, all for the public welfare and for no other purposes," and all other powers given it were made expressly incidental to those purposes. Therefore, the existence in its charter of the authority to "borrow money and to receive, buy, pledge, mortgage, encumber, sell, lease and otherwise acquire by gift, devise or inheritances, real and personal property of any kind and character necessary to promote the objects of the corporation and to hold, use, pledge, mortgage, encumber, sell, invest and re-invest the same * * *" is not a sufficient basis upon which to conclude it was not "organized exclusively" for charitable purposes, so long as the activities engaged in pursuant to that authority did not constitute the carrying on of a trade or business. John Danz Charitable Trust, 32 T.C. 469 (1959), on appeal C.A. 9; Forest Press, Inc., 22 T.C. 265 (1954); Unity School of Christianity, 4 B.T.A. 61 (1926). Thus, whether petitioner was organized exclusively for an exempt purpose depends, at least in part, upon the manner in which it was operated. We are satisfied, after careful consideration of the record, that petitioner *290 was not engaged in the trade or business of buying and selling real estate during the years in issue. First, petitioner's primary purpose was to collect and administer funds for the benefit of the diocese of Columbus, a fact apparent from the circumstances surrounding its organization. Recognizing an immediate need by the diocese for funds to construct a high school, as well as a need on the part of the Sisters of St. Joseph for help in establishing a convent and school, and possessing certain properties which could be committed to these uses, Bauschard organized the petitioner. Facts such as these do not support respondent's contention that petitioner's principal function was intended to be the purchase and sale of real estate. Secondly, the activities relating to the acquisition and disposal of the properties set forth in our Findings fall far short of what might properly be characterized a trade or business. During the 2 years before us, only 6 tracts of property were acquired; each acquisition being the result of a single isolated transaction. Of these, one was acquired by gift; another was acquired as the result of its rejection as a building site for a church; and still another *291 was acquired for the construction of a convent and school. Certainly, these are not the circumstances one would expect to find attendant upon the operation of a real estate business. Moreover, the manner in which the properties were disposed of bears little or no resemblance to the conduct of a trade or business. Petitioner neither directly nor indirectly offered its properties to the public for sale. It did not advertise. It did not list its properties with brokers. Rather, it was content to hold them until such time as attractive offers to purchase might be made. Of the properties acquired during the years in issue, one was donated to St. Mary Magdalene Church, an exempt organization; another was held for the construction of a convent and school; and yet another was still held as of the date of this trial. The remaining properties, with the exception of a 21.2-acre tract sold in 1957, were disposed of during the years in issue in 6 separate sales. In each instance, the property sold consisted of unimproved farmland or vacant lots, and had been held by petitioner for periods ranging from 3 to 12 months prior to its sale. Two of the 6 tracts, consisting of 1.029 and.815 acres, respectively, *292 formed a part of the tract acquired for the construction of a convent and school, and had been determined to be unnecessary for the proposed construction site. These, and other facts of record, have led us to conclude that petitioner's activities with respect to these properties were in fact casual sales of property which had been acquired and held for investment purposes. Thus, we reject respondent's contention that petitioner was engaged, during the years in issue, in the trade or business of buying and selling real estate. But respondent argues further that petitioner's claim for exemption should be denied on the ground that it made its assets available to private individuals without interest and adequate security, and thus was operated for the benefit of those individuals, rather than for exempt purposes. In so arguing, respondent does not rely on the prohibited transactions provision of section 503, since notice as required by section 503(a)(2) was not given petitioner. He does, however, rely on what he maintains was the loan by petitioner of substantial sums of money without interest to the Rosary Development Company and to the Eakin Realty Company. We do not agree with *293 this position. The Eakin loan and the alleged "advance" to the Development Company grew out of the same transaction, i.e., the sale by petitioner in January 1955, of its interest in the Mary Demorest Farm to the Development Company. The sale itself was accomplished on the installment basis, the Development Company issuing petitioner 2 interest-bearing notes, each in the amount of $112,500; 1 due July 1956, and the other due July 1957. As of April 1, 1957, the Development Company had paid $63,000 on its principal indebtedness, but had paid no interest. The record indicates that the failure to make timely payments was the result of financial difficulties incurred in the development and sale of the Demorest tract; more particularly, the threat of foreclosure under mortgages which had been placed on the property by builders, to whom lots had been sold, prior to satisfaction by these builders of the purchase price which they owed the Development Company. Under these circumstances, we cannot accept respondent's characterization of the transaction with the Development Company either as a loan or an advance. Rather, it would appear to us to have been the result of a decision to extend *294 the term of the notes for an indefinite period of time; a decision representing nothing more than the exercise of petitioner's judgment as how to best protect its investment in the property. In the light of the situation which then existed, it would seem those interests were best served by the granting of such an extension. As Bauschard stated, when asked when it was decided to extend the notes: "Well, you often say, "You can't get blood out of a turnip." Well, you can't get blood out of a group without money." Accordingly, we do not view petitioner's action with respect to the Development Company indebtedness as equivalent to its operation for the benefit of private individuals. Much the same can be said for the $5,000 loan made the Eakin Realty Company. Eakin was formed by those involved in the development of the Demorest property in order to assume the builders' liabilities under the defaulted mortgages. In order to accomplish its intended purpose, the completion and sale of the houses on these properties, Eakin was in need of funds. As a means of protecting its investment in this tract, petitioner advanced Eakin the sum referred to. In this act we see neither the motive of *295 aiding private individuals, nor an attempt to trade on a tax exemption, but rather, again, the exercise of petitioner's judgment as to how best to protect its interest in the Demorest tract. The above premises having been considered, we have found as a fact that petitioner was organized and operated during the years in issue exclusively for one or more of the exempt statutory purposes enumerated in section 501(c)(3), and conclude that it is entitled to the exemption from tax which it claims under section 501(a) of the 1954 Code. Having so concluded, we turn to respondent's alternate contention, raised by amended answer, that petitioner, during the years in issue, was engaged in an "unrelated trade or business" within the meaning of section 513, [2] from which it realized "unrelated business taxable income" as defined in section 512, [3] all of which was taxable to it under the provisions of section 511. [4] In essence, respondent argues that petitioner realized unrelated business income from its "real estate operations" during the years in issue, taxable under the provisions of section 511 of the Code. *296 It is at once apparent from a reading of the statute that for petitioner to have had unrelated trade or business income, it must first have been engaged in the carrying on of a trade or business. Thus, the same reasoning which has led us to conclude that petitioner's real estate activities were not of a nature to preclude its claim for exemption under section 501(c)(3), leads us also to conclude that it was not engaged in the carrying on of a trade or business for the purposes of sections 511, 512 or 513. We therefore reject respondent's alternate contention. In the light of these holdings, the additions to tax under section 6651(a) cannot be sustained. Decision will be entered for the petitioner. Footnotes
1. SEC. 502. FEEDER ORGANIZATIONS. An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under section 501 on the ground that all of its profits are payable to one or more organizations exempt under section 501↩ from taxation. For purposes of this section, the term "trade or business" shall not include the rental by an organization of its real property (including personal property leased with the real property).
2. SEC. 513. UNRELATED TRADE OR BUSINESS. (a) General Rule. - The term "unrelated trade or business" means, in the case of any organization subject to the tax imposed by section 511, any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501↩ * * * 3. SEC. 512. UNRELATED BUSINESS TAXABLE INCOME. (a) Definition. - The term "unrelated business taxable income" means the gross income derived by any organization from any unrelated trade or business (as defined in section 513↩) regularly carried on by it, less * * * 4. SEC. 511. IMPOSITION OF TAX ON UNRELATED BUSINESS INCOME OF CHARITABLE, ETC., ORGANIZATIONS. (a) Charitable, Etc., Organizations Taxable At Corporate Rates. - (1) Imposition of Tax. - There is hereby imposed for each taxable year on the unrelated business taxable income (as defined in section 512) of every organization described in paragraph (2) a normal tax and surtax computed as provided in section 11. * * * (2) Organizations Subject To Tax. - (A) Organizations Described in Section 501(c)(2), (3), (5), and (6), And Section 401(a). - The taxes imposed by paragraph (1) shall apply in the case of any organization * * * which is exempt * * * from taxation under this subtitle by reason * * * of paragraph (3) * * * of section 501(c)↩.